OPINION
{¶ 1} This case involves the termination of parental rights. Appellant, Kathy Frasure, the mother of Robert and David Lambert, appeals from a judgment entry of the Geauga Common Pleas Court, Juvenile Division, that granted the motion for permanent *Page 2 
custody filed by the Geauga County Department of Job and Family Services ("GCJFS"). On review, we affirm the judgment entry of the trial court.
 {¶ 2} Frasure was involved in an automobile accident, where she was alleged to be intoxicated and the driver of the car that killed a passenger in an oncoming vehicle. The incident took place in Geneva, Ohio, on March 12, 2005. Her two children, Robert and David Lambert, were passengers in the car at the time of the incident. The boys were age ten and seven, respectively, at the time. Criminal charges against Frasure were pending against her in Ashtabula County during these proceedings and were not concluded as of the permanent custody hearing.
 {¶ 3} On April 8, 2005, GCJFS filed a complaint in the Geauga County Common Pleas Court, Juvenile Division, alleging that the Lambert boys were abused, neglected, and dependent children. On April 11, 2005, GCJFS filed a motion for temporary custody. The boys were immediately placed into foster care by the juvenile court.
 {¶ 4} At first, William Lambert, the biological father of the boys, participated in the proceedings, but by the time of the permanent custody hearing, he was determined to have abandoned the boys. He has not appealed from that determination or from the trial court's order of permanent custody.
 {¶ 5} The court conducted a hearing on GCJFS's motion for temporary custody. Prior to the hearing, both parents had entered pleas of "true" to the allegations that the boys were abused, neglected, and dependent, and the court so found. On May 27, 2005, GCJFS's motion for temporary custody was granted. On that same date, Joel Holland, the significant other of Kathy Frasure, was joined as a party. Holland and Frasure were married during the pendency of this case. He remained as a party until *Page 3 
October 2006, when he was dismissed by the court as no longer a necessary party. The boys remained in foster care up until the time of the permanent custody hearing.
 {¶ 6} GCJFS filed a motion for permanent custody on July 31, 2006. Hearings on the motion took place over three days in November and December 2006. The following relevant testimony was presented at the adjudicatory hearing on GCJFS' motion for permanent custody.
 {¶ 7} The first witness to testify was Joseph Cancilliere, a mental health therapist from Community Counseling of Ashtabula, who did an intake interview in June 2005 with Frasure and Holland pursuant to court-ordered counseling. He obtained a history from Holland that included bipolar disorder and substance abuse, including marijuana, alcohol, and cocaine. He obtained a history from Frasure that included depression and alcohol use. She also admitted that she had been drinking on March 12, 2005, the day of the accident. Cancilliere then assigned them to a therapist.
 {¶ 8} The next witness, Tracy Filapasic, also worked for Community Counseling. She was the supervisor of the dual diagnosis program and did a drug and alcohol assessment on Holland. Holland told her that he had not abused any substances for six months and was in a recovery program. Based on this information, she diagnosed his substance abuse problem as alcohol abuse in remission.
 {¶ 9} Ronald Yendrek, the staff psychiatrist at Community Counseling, testified next. He diagnosed Holland with a bipolar disorder and also diagnosed him as alcohol dependent, because Holland told Yendrek that he had lied about his alcohol use during Filapasic's evaluation. *Page 4 
 {¶ 10} The next witness, Judy Owen, testified that she was a case manager at GCJFS and determined food stamp benefits for Holland and Frasure. Holland qualified for food stamps, because he was disabled and was on Medicaid, and Frasure qualified for food stamps, because she was receiving workers' compensation benefits. In September 2005, after they failed to appear for a review, their food stamp benefits were terminated.
 {¶ 11} Judi Miller, a licensed chemical dependency counselor at Lake Area Recovery Center, testified that Frasure received an assessment from her agency in April 2005. At that time, she was referred for intensive outpatient treatment, having been diagnosed as alcohol dependent and having used cocaine episodically. Though Frasure completed the intensive outpatient treatment program, Miller testified that Frasure would sometimes fall asleep in group therapy sessions, displayed "resistance," and failed to "internalize" the program. Miller attributed the sleep episodes to the fact that Frasure was on prescription medications. She also questioned the authenticity of the Alcoholics Anonymous attendance sheets that Frasure turned in. Miller alluded to the fact that all of Frasure's drug screens were negative except for prescription medications. Finally, Miller testified that, had she known about positive tests for cocaine use, she would have recommended residential treatment instead of outpatient treatment.
 {¶ 12} Christina Fowler, a mental health therapist, testified about her interaction with Robert, the older of the two boys. She testified that she diagnosed him with an adjustment disorder with mixed emotional and conduct disturbances. This would manifest itself in inappropriate behavior in the foster home and at school. After about a *Page 5 
year of therapy consisting of 57 sessions, Robert opened up concerning his mother's drinking and drug use, as well as her selling prescription medications and ingesting crystal meth. Robert also told Fowler about the many incidents of domestic violence initiated by his biological father. As for Holland, Robert felt positively about Holland. Fowler had two joint sessions with Robert and Frasure, but Frasure broke off the joint sessions on the advice of her attorney. Finally, Fowler testified that Robert told her that his mother tried to get him to lie in his court testimony and say that she was not the driver of the vehicle when the oncoming vehicle was hit.
 {¶ 13} Next to testify was Anna Tyrrell, a mental health therapist in private practice, who had a relationship with Frasure going back to 2003, when she was trying to regain custody of her children from the biological father. Tyrrell met with Frasure and her boys on numerous occasions until May 2004, when Frasure regained their custody. Tyrrell was again contacted for counseling after the accident in March 2005, but Frasure did not resume counseling until the fall of 2005.
 {¶ 14} Tyrrell testified that she was in favor of reunification of the boys with Frasure and Holland, that Frasure "can do it" and that "she would do a fine job[.]" This was based on the fact that Frasure had completed Tyrrell's parenting classes and that she had completed her case plan. Tyrrell testified that Frasure and Holland were functioning well as a couple and that they would provide a suitable home environment for the boys. She also testified that when she approached GCJFS officials concerning reunification, she was met with a hostile and adversarial attitude.
 {¶ 15} Lauren Vinsick was the next witness. Ms. Vinsick was a laboratory manager at Omega Laboratories. She testified regarding hair samples submitted to the *Page 6 
lab for drug analysis. Results from Holland's hair samples between March and September 2006 indicated positive results for cocaine, except for one test whose quantity was insufficient. Frasure's hair samples also tested positive for cocaine on three of five tests taken between November 2005 and March 2006.
 {¶ 16} The next witness to testify was a co-worker of Holland's at Arby's. Holland worked there for one month in July to August 2006, when he was fired. The day before he was fired, this co-worker, Ruth Zunic, smelled alcohol on his breath and sent him home.
 {¶ 17} The next witness, Kathleen Allen, was the counselor for David, the younger of the two boys. She worked at the North Coast Center. David had been in counseling with her since July 2005, and continued to see her weekly up until the date of the hearing. She diagnosed David with an adjustment disorder with emotional features. She also testified he had anxiety, because of the uncertainty as to where he would be living. Allen did not realize that reunification was a goal until she appeared at a court hearing in December 2005.
 {¶ 18} Kathleen Malobenski, an official from Robert's previous school, testified next. She was testifying out of order for Frasure. Malobenski testified that Frasure had contacted the school regarding difficulties she was having with Robert and that Frasure attended conferences at school regarding Robert's progress with his learning disability.
 {¶ 19} Katherine Singer, a child support enforcement officer from GCJFS, testified next. She testified that Frasure had built up an arrearage of $275 for each of the boys; that the child support order was issued in September 2005; and that since *Page 7 
November 2005, when her child support payment was deducted from her workers' compensation check, her payments had been regular.
 {¶ 20} The next witness, Dawn Bates, was under contract with GCJFS to do a home study of Frasure's home. As part of the home study, she conducted a criminal background check of Holland and Frasure. Holland's criminal history included convictions for retail theft in 1998, DUI in 2003, disorderly conduct in 2003, disorderly conduct in 2004, and contempt proceedings for unpaid fines. Frasure indicated to Bates that she had spent eight months in prison in 2002 for a theft offense. In addition, her criminal history indicated that she had a DUI conviction in 1989 and that she had a pending DUI charge from April 2005.
 {¶ 21} Bates visited Frasure's home and found it to be clean. This visit was in July 2005, and Holland had been put out of Frasure's home at that time. The home study was updated in March 2006, because Holland was back in the home. During this latter visit, Frasure vented a lot of anger about her social worker, her therapist, and her attorney. She also told Bates that she was not the driver in the March 2005 accident, that a friend was driving the car at that time.
 {¶ 22} Bates further testified that she had concerns about Holland being off his medication in July 2005, as reported by Frasure, and also about his criminal background and drug and alcohol history. Bates said she had concerns about Frasure's criminal background and her history of drug and alcohol use. Bates prepared two home study reports, one for Holland and one for Frasure, but did not make any recommendation regarding the fitness of the home to house the boys in the future. *Page 8 
 {¶ 23} Next, the foster mother testified concerning the 19 months the boys had been residing with her, including their behavior, their attendance at counseling sessions, and the interaction with Frasure on the two occasions Frasure visited with the boys in the foster mother's home.
 {¶ 24} Kelly Conroy, a GCJFS social worker, testified next. The two Lambert boys were assigned to her caseload in June 2005. She testified that the boys were removed from Frasure's home not because of the March 12, 2005 accident, but because of GCJFS's concern for the two boys. The boys were in the car when Frasure had the accident and she had been drinking that day. A safety plan was put into effect on April 8, 2005, the same day that GCJFS filed its complaint that the boys were abused, neglected, and dependent. The safety plan required Frasure to wear a pager and to submit to drug and alcohol testing within one hour of being paged, but Frasure failed to respond to two pages. A social worker from GCJFS went to the home on April 11, 2005, and could find no one at home. She also went to the boys' school that day and was told that the boys were not in attendance and that Frasure intended to withdraw the boys from the school. That same day GCJFS filed for temporary custody.
 {¶ 25} Conroy stated that her objective was "to work with the family, to try to reach the goal of the case plan." Requirements of the case plan for Frasure included her remaining healthy, getting an alcohol and drug assessment and following its recommendations, obtaining an updated mental health assessment, maintaining stable housing and employment, and wearing a pager for the purpose of taking random drug tests. Holland also had a case plan, which included getting a drug and alcohol assessment as well as a mental health assessment. He was also to wear a pager. *Page 9 
Conroy was unable to oversee Holland's compliance with his case plan in the last six months of 2005, because his whereabouts were unknown during that time.
 {¶ 26} Conroy testified about positive drug tests for Frasure in September and November 2005, and then again in early 2006. Frasure denied using drugs during those times and at all other times during the pendency of this case. Conroy also said that Frasure had cut her hair short (less than two inches) in order to stymie GCJFS's testing of her hair, though by early 2006 she came into compliance in this respect. Since February 2006, Frasure did not have any positive drug test results.
 {¶ 27} The case plan was amended in April 2006 to require joint counseling with the boys. Updated drug and alcohol assessments were also required of Frasure and Holland in the event of a positive drug test result. Holland had one positive drug test result in September 2006, but did not get an assessment and, in addition, did not get an updated mental health assessment, as required.
 {¶ 28} Conroy further testified that she had home visits with Frasure suspended, because of the hostility Frasure had shown toward Conroy. For example, Frasure told Conroy that she had bought a dog and that she was going to train it to attack Conroy.
 {¶ 29} During 2006, Frasure had supervised visitation at GCJFS for two hours per week. In the nearly five months prior to the hearing, Frasure cancelled nine of those visits. In addition, in August and September 2006, she neglected to respond to five separate pages for drug tests.
 {¶ 30} Conroy endeavored to get information from Frasure's service providers in mid-2006. To that end, she sent releases to Frasure for her signature, but did not get *Page 10 
them back until four days before the review hearing on October 2, 2006; and then, on October 4, 2006, Frasure revoked the releases.
 {¶ 31} In Conroy's opinion, as of the date of the hearing, Frasure had not been using drugs, but Holland had been and that "drugs are still part of [Frasure's] household." She also voiced concern over the consistently positive drug test results for Holland while the case was pending as well as Frasure's positive drug tests results through February 2006. When Conroy was asked if Frasure was "taking responsibility for any of her actions in this case," Conroy stated that "[s]he hasn't."
 {¶ 32} The next witness was Ann Willoughby, the guardian ad litem for the boys, who testified that she had been working with the boys for 11 months and that it was her recommendation that permanent custody by awarded to GCJFS. At that point, GCJFS rested and Frasure presented her case-in-chief.
 {¶ 33} Frasure's first witness was Eiter Baumgart. Mr. Baumgart met Frasure at a campsite in April 2005 and observed that her pager failed to function. Frasure became concerned about the inability of the pager to function and tried to use a payphone to contact GCJFS. He also testified that, in his opinion, Frasure was a good mother.
 {¶ 34} Frasure's next witness was Attorney John Salem, Frasure's attorney in the pending criminal matter in Ashtabula County. He testified that he advised his client not to go to joint counseling in order to protect her rights against self-incrimination.
 {¶ 35} Frasure was the next witness to testify. She testified about the abusive relationship she had with the boys' biological father, from whom she finally separated in 2001. The boys' father had custody at first, but then she was able to regain custody in *Page 11 
2004. That is when she started counseling with Anna Tyrrell. She was attentive to the boys' educational needs, because they each had their difficulties in school.
 {¶ 36} After she agreed to the safety plan on Friday, April 8, 2005, she was given a pager, which malfunctioned. There was confusion over that weekend between her and Sarah Welch, the GCJFS social worker, about whether she was to report for a drug and alcohol test. The following Monday (April 11), Sarah Welch told Frasure that GCJFS was filing for temporary custody.
 {¶ 37} Frasure testified that the initial case plan of May 17, 2005 required her to get a drug and alcohol assessment, to get a mental health assessment, to follow the recommendations of those assessments, to carry a pager, and to work with the case worker. She then testified that over the course of the case she did all that was required of her to do in terms of the assessments and follow-up counseling, but that she had difficulties at various times responding to pages because of car problems or medical problems. She also had difficulty working with the social workers assigned to her case, especially regarding her supervised visitation. She felt the social workers were unduly restrictive regarding her visitation with the boys. She requested joint counseling early on, but when she finally got joint counseling, the counselors only wanted to talk about the auto accident and, on the advice of her attorney, she stopped attending joint counseling.
 {¶ 38} Frasure testified that her last job was in 2003, that she was injured on that job, and she had been receiving workers' compensation benefits until September 2006. She said that she has been married to Joel Holland for about one year and that he has been very supportive of the household, the boys' upbringing, and the family. *Page 12 
 {¶ 39} On cross-examination, Frasure admitted that her second son testified positive for cocaine at birth and that she went to residential treatment after his birth. Her relationship with the boys' father started in 1990, her drug use started in 1993 or 1994, and she stayed with him for 11 years. The boys' father, according to Frasure, was physically abusive of her and the boys, was a drug dealer, and was heavily into criminal activity. Frasure was imprisoned for eight months in 2002, custody was given to the boys' father that year, and Frasure sought to regain custody in 2003. She successfully regained custody of the boys in 2004. Frasure believed that the only reason that GCJFS still had temporary custody as long as it had was "[b]ecause [GCJFS] anticipates a conviction," meaning that it felt she would be convicted of vehicular homicide and sent to prison. In her judgment, she had completed all the drug and alcohol programs required of her, so that only the prospect of a conviction stood in the way of her regaining custody of the boys. Frasure admitted to not responding to pages for drug tests in the two months prior to the permanent custody hearing.
 {¶ 40} Next, Kathy Vickery testified as a character witness. Ms. Vickery runs the food program for needy families at a local church in Thompson. She has had interaction with Frasure and her boys since 2002 and saw them as a normal, loving family. She admitted that she had not seen the boys since Christmas 2004 and has never been to Frasure's home. Vickery had no experience with Frasure as a person who abused drugs or alcohol.
 {¶ 41} Anna Tyrrell testified for Frasure. She is Frasure's counselor. Tyrrell testified as to Frasure's efforts to comply with the case plan, as well as her frustrations with GCJFS and the perceived lack of cooperation of the social workers at that agency. *Page 13 
Tyrrell expressed the opinion that, as a result of counseling, Frasure had made a lot of progress in dealing with her relationship issues and her defense mechanisms following incidents of domestic violence with Lambert, the boys' father. This progress, according to Tyrrell, allowed Frasure to better deal with her current relationship with Holland.
 {¶ 42} After Frasure rested her case, GCJFS put on Sarah Welch as a rebuttal witness. She was the social worker who attended to setting up Frasure with a pager on April 8th, 2005. Welch testified that, contrary to Frasure's testimony, the pager did work, that Welch paged Frasure three times over the weekend of April 8th, but Frasure did not respond to any pages. She also testified that Frasure refused to tell Welch the location of her children after GCJFS had secured an order of temporary custody.
 {¶ 43} The motion for permanent custody was granted by the trial court on December 7, 2006. In its judgment entry, the trial court stated, in pertinent part:
 {¶ 44} "The court finds by clear and convincing evidence that * * *
 {¶ 45} "The children * * * cannot be placed with either of the child(ren)'s parents within a reasonable time and should not be placed with the parents. * * *
 {¶ 46} "* * *
 {¶ 47} "[Frasure] tested positive for cocaine use three times during the course of this case. * * * On the last day of the permanent custody hearing * * * [w]hen she testified in the early afternoon her speech was mildly slurred and her testimony was less coherent than when she had testified on a previous day * * * [that] left the court with a strong impression that she was hung over and mildly under the influence[.] *Page 14 
 {¶ 48} "* * * Robert's counselor reports that Robert has told her that [Frasure] has encouraged them to lie in an upcoming criminal case [concerning whether Frasure was the driver of the vehicle].
 {¶ 49} "* * *
 {¶ 50} "[Frasure] has demonstrated a lack of commitment to the minor children by failing to meaningfully work toward addressing the issues and concerns that caused the children to be removed from her custody. She fails to take any responsibility for why the children were removed[.]
 {¶ 51} "* * *
 {¶ 52} "Although [Frasure] has completed substance abuse treatment and has participated in counseling on a regular basis as part of the case plan in this case, she has failed to internalize changes in her lifestyle that would cause this court to believe the children could be returned to her and that they would be raised in a nurturing, drug and alcohol free environment. * * * [Frasure] continues to make poor lifestyle decisions by choosing to marry and stay with a man who continues to abuse alcohol and cocaine. * * * [Frasure] tested positive for cocaine use just days after completing the substance abuse treatment program.
 {¶ 53} "* * *
 {¶ 54} "The children have been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period ending immediately prior to the filing of the motion for permanent custody.
 {¶ 55} "* * * *Page 15 
 {¶ 56} "The court finds it to be in the child(ren)'s best interest and does hereby order that permanent custody of Robert * * * and David * * * be granted to [GCJFS]."
 {¶ 57} Frasure timely filed her notice of appeal and assigned as error the following:
 {¶ 58} "The trial court erred in granting the motion for permanent custody as such decision was against the manifest weight of the evidence and resulted in a manifest miscarriage of justice."
 {¶ 59} In light of the recent case of In re C.F., we must address a preliminary matter regarding reasonable efforts at reunification of the minor children with Frasure.[1] In that case, the Supreme Court of Ohio answered the following certified question: "`[w]hether a reasonable efforts determination is required in motions for permanent custody filed pursuant to R.C. 2151.413.'"[2] That court upheld the principle "that, except for a few narrowly defined exceptions, the state must have made reasonable efforts to reunify the family prior to the termination of parental rights."[3] At issue, however, was the narrower question: "whether, pursuant to R.C. 2151.419, the court must make a determination that such reasonable efforts have been made at the time it decides a motion for permanent custody filed pursuant to R.C. 2151.413."[4] That court answered the certified question in the negative.[5] *Page 16 
 {¶ 60} The reason this preliminary issue must be addressed in this case is because the Supreme Court of Ohio also stated:
 {¶ 61} "[T]he state must still make reasonable efforts to reunify the family during child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time."[6]
 {¶ 62} Thus, we read In re C.F. to require a reviewing court, where the trial court has awarded permanent custody to a county children's services agency, to review the record to ensure that the record reflects that the state agency made reasonable efforts to reunify the minor child or children with their family while the child-custody proceedings were in progress and before the permanent custody proceeding. If not, then the agency must establish at the permanent custody hearing that such efforts were made.
 {¶ 63} Frasure argues that between providing pagers that did not work and failing to provide the residential drug treatment that was recommended for her, GCJFS did not make reasonable efforts at reunification. She attributes the reason for GCJFS not making reasonable efforts at reunification as the assumption on the part of the social workers that she would be going to prison and, therefore, GCJFS "needed to keep the children." We do not agree that the record supports her argument in this respect. *Page 17 
 {¶ 64} The record is clear that reasonable efforts at reunification were made by GCJFS prior to the permanent custody hearing. The trial court was called upon to address four separate motions for reunification filed by Frasure. The gist of her motions was that she had completed her case plan and treatment for alcoholism and should, therefore, have her children returned to her. In each case, however, the trial court denied her motion for reunification. In judgment entries dated September 8, 2005, December 6, 2005, April 10, 2006, July 11, 2006, and October 3, 2006, the trial court found that "GCJFS has used reasonable and diligent efforts to prevent the continued removal of the children from the children's home." Moreover, in each of the above judgment entries, the trial court went on to explain why it was denying Frasure's motions for reunification. For example, in the judgment entry of September 8, 2005, the trial court stated: "there has been little progress in addressing the substance abuse issues, relationship issues, and parenting issues initially identified in the case plan." The trial court's attention to Frasure's motions for reunification satisfies the inquiry as to whether GCJFS made reasonable efforts at reunification prior to the permanent custody hearing, an issue that was discussed in the In re C.F. case.
 {¶ 65} Moving on to an analysis of the manifest weight of the evidence, the applicable standard of review has been stated as follows:
 {¶ 66} "A court of appeals is guided by a presumption that the findings by the trier of fact were correct.[7] A judgment supported by some competent and credible evidence will not be reversed as being against the manifest weight of the evidence."[8]."[9] The *Page 18 
quantum of proof in the trial court is clear and convincing evidence in order to grant permanent custody.[10]
 {¶ 67} In Frasure's assignment of error, she argues that she completed the goals of the case plan, that she had suitable housing and sufficient income to provide for the boys, that there were regular deductions from her workers' compensation check for child support, and that she tested negative for drugs and alcohol for months at a time. Yet, all that she was afforded by GCJFS were strictly supervised visitations. She also quarrels with the trial court's finding that she failed to "internalize" her recovery. In her estimation, GCJFS required perfection of her in terms of her efforts to gain reunification, while she asserts that she "substantially" remedied the causes that caused the boys' removal. As for her chemical dependency, Frasure argues that there was not clear and convincing evidence of its severity such that the boys should have been removed from her care. She admits to "sporadic relapses," but this was not enough to make her unfit.
 {¶ 68} We recognize that in permanent custody proceedings, the termination of parental rights is the "`"family law equivalent of the death penalty."`"[11] We also recognize that the parties to such actions must be afforded every procedural and substantive protection the law allows.[12] The juvenile court can exercise jurisdiction to grant a motion for permanent custody only if the conditions that caused the children to be removed in the first place have not been remedied.[13]
 {¶ 69} This court has previously delineated the guidelines to be followed by the trial court in a determination of permanent custody. *Page 19 
 {¶ 70} "R.C. 2151.414 sets forth the guidelines that a juvenile court must follow when deciding a motion for permanent custody. R.C.2151.414(A)(1) mandates that the juvenile court must schedule a hearing and, provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 71} "Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (1) the child is not abandoned or orphaned [or has not been in the temporary custody of a public children services agency for 12 of 22 months], and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned and the parents cannot be located; (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (4) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 72} "Therefore, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child. *Page 20 
 {¶ 73} "If the child is not abandoned or orphaned [or has not been in the temporary custody of a public children services agency for 12 of 22 months], then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the juvenile court must consider all relevant evidence before making this determination. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the conditions enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 74} "Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody. *Page 21 
 {¶ 75} "The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.[14]
An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence.[15]"[16]
 {¶ 76} In the instant case, the trial court made a determination that the boys could not be placed with either parent within a reasonable time and should not be placed with them [R.C. 2151.414(B)(1)(a)]. It also made a determination that the boys had been placed in GCJFS' temporary custody for at least 12 of 22 months prior to the filing for permanent custody [R.C. 2151.414(B)(1)(d)].
 {¶ 77} We note that the determinations under "(B)(1)(a)" and "(B)(1)(d)" are mutually exclusive, because the "(B)(1)(a)" determination is conditioned on the minor child being in the public service agency's custody for less than 12 months, whereas the "(B)(1)(d)" determination is conditioned on the minor child being in the custody of the public service agency for more than 12 months of the last 22 months. *Page 22 
 {¶ 78} A further difference between the two subsections is that a determination under "(B)(1)(d)" requires no more than a calculation that the minors were in the temporary custody of the public service agency for the required 12 of 22 months, whereas a determination under "(B)(1)(a)" examines the suitability of the parents if the requisite time period (12 of 22 months) is not met. Thus, there is no consideration under "(B)(1)(d)" of the fitness or suitability of the parents.
 {¶ 79} While some published opinions from this court have expressed displeasure at the statutory scheme that allows the juvenile court to bypass a determination of the parents' unfitness based solely upon placement of the minor children in temporary custody for the requisite period of time (12 of 22 months),[17] and that the parents' right to be found fit or unfit for continued parenting is short-circuited by such a system, in this case we note that the trial court went out of its way to demonstrate cogent reasons for its findings that the boys could not and should not be placed with Frasure. Nevertheless, the Lambert minors were in the custody of GCJFS for more than 12 months and, therefore, the trial court's determination under "(B)(1)(a)" must be disregarded as that subsection was not applicable to the instant case.
 {¶ 80} Further, the trial court found that it would be in the best interest of the boys to be removed from Frasure's care. Among the court's findings is the following: *Page 23 
 {¶ 81} "The children have a strong need for placement in legally secure permanent placement that provides stability; is free from physical and verbal abuse; and is free from substance abuse. Without such an environment the children could be expected to regress in the progress that has been made. Such a permanent placement can not be achieved without a grant of permanent custody to [GCJFS]."
 {¶ 82} Frasure argues that she is a loving mother and the best interest of the children is to stay with her. However, as stated by the Supreme Court of Ohio: "the trial court [is not] required to credit evidence in support of maintaining the parental relationship when evidence supporting termination outweighs it clearly and convincingly."[18] We are convinced from a review of the record that there was clear and convincing evidence to support the trial court's finding that the best interest of the children was for permanent custody with GCJFS.
 {¶ 83} Frasure's final issue for review is that the trial court did not exhibit the impartiality necessary to protect her due process rights and that the trial court acted as an advocate for the state. Thus, according to Frasure, the trial court lost its way in adjudicating this matter, as borne out by the court's admission of hearsay testimony and then basing its decision on such hearsay testimony.
 {¶ 84} We review the trial court's admission of evidence under an abuse of discretion standard. As stated by this court, "[t]he admission of relevant evidence is within the sound discretion of the trial court.[19] A reviewing court will not reverse the trial court's admission of evidence absent an abuse of discretion.[20]"[21] *Page 24 
 {¶ 85} Frasure points to four instances of hearsay testimony that should not have been admitted: (1) statements concerning Holland that were made by Holland while he was still a party to the case; (2) statements by Robert's counselor that he had been told to lie by Frasure in his court testimony; (3) a psychiatrist's testimony as to what he was told by others; and (4) statements made by the guardian ad litem in her report. She cites to this court's decision in In re Roque for support for the proposition that her due process rights were violated.[22] Her reliance on our decision in In re Roque is misplaced.
 {¶ 86} In re Roque was an ineffective assistance of counsel case, where appellant's counsel fell woefully short of the standard for reasonably effective representation and where, as a result, appellant was prejudiced by such ineffective representation.[23] Frasure is not asserting that her counsel was ineffective. In fact, the record shows that Frasure's counsel exhibited none of the deficiencies that were present in In re Roque.
 {¶ 87} Instead, Frasure relies on In re Roque to argue that the trial court committed numerous evidentiary errors that deprived her of her due process rights and points to this court's statement in that regard: "the admission of hearsay and complete disregard for [appellant's] statutory and constitutional due process rights makes it impossible to glean from the record the reliability of the state's case."[24] We turn, then, to a consideration of the hearsay testimony that was admitted by the trial court. In this regard, we are guided by the following statement from the Eighth Appellate District: *Page 25 
 {¶ 88} "Where a trial judge acts as the finder of fact, as in this case, a reviewing court should be reluctant to overturn a judgment on the basis of the admission of inadmissible testimony, unless it appears that the trial court actually relied on such testimony in arriving at its judgment, because the trial judge is presumed capable of disregarding improper testimony."[25]
 {¶ 89} The first hearsay statement is a statement made by Holland while he was a party to the case. The statement consisted of an admission to a co-worker at Arby's, where he was formerly employed, to the effect that he had been drinking the night before his duty shift. The trial court admitted the co-worker's statement on the basis that it was made by Holland while he was still a party in the case.[26]
 {¶ 90} Even though Holland made the statement to the co-worker while he was a party in the case, we find the ruling of the trial court to be erroneous, because Holland was not a party when the testimony was offered. As a non-party, Holland was not in court to refute the statement, which is the rationale for admitting statements under Evid.R. 801(D)(2).[27] However, the error is harmless, because the trial court did not use this statement in the basis for its decision. That part of the trial court's decision that mentioned that Holland was fired for his use of alcohol on the job was elicited from another witness, and not this co-worker. *Page 26 
 {¶ 91} The next hearsay statement that Frasure finds inadmissible is a statement by Robert's counselor to the effect that Robert was told by Frasure to lie in his court testimony about whether she was the driver of the vehicle in the fatal accident. This statement is double hearsay that comes within the purview of Evid.R. 805. That rule provides that, to be admissible, each part of a statement containing hearsay within hearsay must conform to an exception to the hearsay rules.[28]
However, the error, if any, is harmless in light of the fact that Dawn Bates, the person who did the home study, testified that Frasure herself said that she was not the driver of the vehicle. There was no objection to Bates' testimony. Thus, there was other evidence that was competent and credible and not objected to which makes this error harmless.
 {¶ 92} Frasure next argues that statements that were told the counselors by others should not have been admitted by the trial court because they were hearsay. However, she points to no specific testimony of Robert's counselor or David's counselor in support of her assertion. She does, however, point to testimony of Dr. Ronald Yendrek, a staff psychiatrist where Frasure and Holland received drug and alcohol assessments. When asked by counsel for GCJFS concerning his evaluation of Holland, Yendrek was asked if he was able to corroborate the information given him by Holland:
 {¶ 93} "[Q:] Were you able to corroborate whether he was doing his drug counseling or whether or not he had used drugs prior to coming in to see you?
 {¶ 94} "[A:] The information we received later indicated that there was still active substance abuse." *Page 27 
 {¶ 95} Note that, in context, Yendrek's answer appears to refer to active substance abuse by Holland, and not Frasure. Further, the complaint that this testimony suffers from the same infirmity found inIn re Walker falls short, because the expert witness in that case testified as to clinical conclusions that were made by other clinicians.[29] Yendrek's testimony, by contrast, merely refers to information he received about Holland from others; it is not his conclusion. Moreover, the error, if any, is harmless because of other overwhelming evidence that documented substance abuse by Holland.
 {¶ 96} Finally, Frasure asserts that the report of the guardian ad litem is rife with hearsay testimony. However, the guardian ad litem testified in this case, and, therefore, she and her report were subject to being cross-examined. Frasure's counsel did not object to the admission of the report and asked no questions of the guardian ad litem when she testified, thus waiving any objection she may have had. Moreover, the report of the guardian ad litem is required to be filed pursuant to R.C. 2151.414(C).
 {¶ 97} Therefore, we conclude that Holland's statement to his co-worker at Arby's, the statement of Robert's counselor concerning whether Frasure tried to get Robert to lie about whether she was the driver of the vehicle, and the statement by Dr. Yendrek were harmless errors in light of other testimony and evidence that supported the trial court's decision to award permanent custody to GCJFS. Otherwise, the trial court did not abuse its discretion in admitting any of the hearsay testimony about which Frasure complains. Recognized exceptions to the hearsay rules permitted the admission of such testimony. *Page 28 
 {¶ 98} For the reasons stated, we conclude that there was clear and convincing evidence for the trial court to grant GCJFS' motion for permanent custody. The judgment entry was not against the manifest weight of the evidence.
 {¶ 99} Frasure's assignment of error is without merit.
 {¶ 100} The judgment of the trial court is affirmed.
MARY JANE TRAPP, J., concurs, DIANE V. GRENDELL, J., concurs in judgment only.
[1] In re C.F., 113 Ohio St.3d 73, 2007-Ohio-1104.
[2] Id. at ¶ 2.
[3] Id. at ¶ 21.
[4] Id.
[5] Id. at ¶ 43.
[6] Id.
[7] Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80.
[8] Id. at 80.
[9] In re Reigle (Nov. 4, 1993), 3d Dist. No. 5-93-23, 1993 WL 451203, at *2.
[10] R.C. 2151.414(B)(1).
[11] (Citations omitted.) In re Hoffman, 97 Ohio St.3d 92,2002-Ohio-5368, at ¶ 14.
[12] Id.
[13] In re Veverka (Sept. 30, 1999), 11th Dist. No. 98-A-0053,1999 WL 997511, at *6.
[14] In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368.
[15] In re Jacobs (Aug. 25, 2000), 11th Dist. No. 99-G-2231, 2000 Ohio App. LEXIS 3859, at *8.
[16] In re Krems, 11th Dist. No. 2003-G-2535, 2004-Ohio-2449, at ¶ 31-36.
[17] See, e.g., In re Stillman, 155 Ohio App.3d 333, 2003-Ohio-6228, at ¶ 70 (O'Neill, J., dissenting).
[18] In re Schaefer, 111 Ohio St.3d 498, 2006-Ohio-5513, at ¶ 56.
[19] State v. Kinley (1995), 72 Ohio St.3d 491, 497.
[20] Peters v. Ohio State Lottery Comm. (1992), 63 Ohio St.3d 296,299.
[21] In re Davis, 11th Dist. No. 2004-A-0068, 2005-Ohio-411, at ¶16.
[22] In re Roque, 11th Dist. No. 2005-T-0138, 2006-Ohio-7007.
[23] Id. at ¶ 9-13.
[24] Id. at 13.
[25] (Citations omitted.) In re T.M., 8th Dist. No. 83933,2004-Ohio-5222, at ¶ 24.
[26] See Evid.R. 801(D)(2).
[27] See staff comments to Evid.R. 801.
[28] See, e.g., State v. Vinson (1990), 70 Ohio App.3d 391, 399.
[29] In re Walker, 11th Dist. No. 2002-A-0089, 2003-Ohio-799. *Page 1