[Cite as *In re M.D.*, 2022-Ohio-1462.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## GEAUGA COUNTY

| | |
|---|---|
| IN THE MATTER OF:<br><br>M.D., DEPENDENT CHILD | **CASE NO. 2021-G-0038**<br><br>Civil Appeal from the<br>Court of Common Pleas,<br>Juvenile Division<br><br><br>Trial Court No. 2019 JF 000342 |

**O P I N I O N**

Decided: May 2, 2022
Judgment: Affirmed

*James R. Flaiz*, Geauga County Prosecutor, and *Christian A. Bondra*, Assistant Prosecutor, Courthouse Annex, 231 Main Street, Chardon, OH 44024 (For Appellee Geauga County Job and Family Services).

*Mandy J. Gwirtz*, Gwirtz Law, LLC, 20050 Lakeshore Boulevard, Euclid, OH 44123 (For Appellant S. D.).

*Susan M. Ebersbacher* and *Carolyn Snyder*, CASA for Kids of Geauga County, 470 Center Street, Building 5C, Chardon, OH 44024 (Guardian ad Litems).

MARY JANE TRAPP, J.

{¶1}  Appellant, S.D. ("S.D."), appeals from the judgment of the Geauga County Court of Common Pleas, Juvenile Division, which terminated her parental rights and granted permanent custody of her minor son, M.D., to appellee, Geauga County Job and Family Services ("GCJFS").

{¶2}  S.D. raises one assignment of error on appeal, contending that the trial court's judgment granting permanent custody of M.D. to GCJFS is contrary to the manifest weight of the evidence.  Specifically, S.D. contends that a legally secure

permanent placement for M.D. could have been achieved without a grant of permanent custody to GCJFS.

{¶3}   A most careful review of the record and pertinent caselaw reveals S.D.'s assignment of error is without merit.  The crux of this troubling case is that S.D. has substantially complied with GCJFS' case plan; however, the evidence in the record and presented at the hearing reveals that she continues to struggle with her sobriety and prescription medication compliance and that she has demonstrated a lack of parental capacities even with a parenting coach.  There is no indication she will ever demonstrate the parental capacities she needs to parent a child with the type of behavioral issues M.D. faces while simultaneously addressing her mental health and substance abuse issues.  We recognize the love and concern they share for each other and agree with the trial court that their relationship should continue to be encouraged and developed in a therapeutic setting.  However, our review also leads us to conclude that the trial court's finding that a legally secure permanent placement cannot be achieved without a grant of permanent custody to GCJFS is supported by competent, credible evidence and that the manifest weight of the evidence supports the trial court's judgment.

{¶4}   The judgment of the Geauga County Court of Common Pleas, Juvenile Division, is affirmed.

## Substantive and Procedural History

{¶5}   In early November 2019, GCJFS filed a complaint in the Geauga County Court of Common Pleas, Juvenile Division, alleging that M.D., who was 9 years-old at the time, was a dependent child and requesting temporary custody.  The complaint alleged that on October 15, 2019, M.D.'s legal custodian and half-sibling, Latisha E. (who was

2

awarded legal custody by the Geauga County Court of Common Pleas, Juvenile Division, in 2018), contacted a GCJFS caseworker and asked for M.D. to be removed from her home due to her inability to manage his behavior. S.D. signed a voluntary agreement for temporary custody, which stated that M.D. would be placed in GCJFS' temporary custody for 30 days. GCJFS placed M.D. in a therapeutic foster home in Akron, Ohio. During this time, Latisha E. had minimal contact with the caseworker, and she did not express a desire to reunify with M.D. M.D.'s father is deceased, and his mother, S.D., whose location was unknown, has a history of mental health and substance abuse.

{¶6} The court held an initial hearing, during which it appointed counsel and entered pleas of "not true" for Latisha E. and S.D. After considering the evidence, the court found there was reason to believe that M.D. was dependent. The court found temporary custody of M.D. with GCJFS to be in M.D.'s best interests and issued its standard protective supervision and temporary custody orders.

{¶7} The trial court appointed Carolyn Snyder of CASA for Kids of Geauga County (Court Appointed Special Advocate) as M.D.'s guardian ad litem (the "GAL").

{¶8} As documented in GCJFS' January case plan filed with the trial court, in December 2019, Latisha E. expressed that she did not wish to reunify with M.D., and the trial court removed her as a party to the case. In addition, S.D. advised her attorney that she would like to be a placement option for M.D. She reported that she was homeless, lived in a shelter, worked part-time, and has nine children of whom she does not have custody. S.D. was diagnosed with major depressive disorder and alcohol use disorder. She has a history of non-compliance with her prescription medication and was hospitalized three times in 2019 for suicidal ideations.

3

Case No. 2021-G-0038

**M.D. Is Found Dependent**

{¶9} In late December 2019, at a pretrial hearing, S.D. entered a plea of true to the dependency allegation in the complaint. The court accepted her plea and found M.D. to be dependent pursuant to R.C. 2151.04(C). The court ordered temporary custody of M.D. to continue with GCJFS and ordered GCJFS to continue to file monthly case plan updates.

**Trial Court Finds GCJFS Made Reasonable Efforts**

{¶10} On October 20, 2020, one year after GCJFS filed its dependency complaint, the court issued an order upon its own motion. The court found that GCJFS made reasonable efforts to finalize a permanency plan for M.D., including contacting S.D. regarding case plan compliance, reaching out to kinship placement, engaging services for both S.D. and M.D., and reaching out to new placement options as necessary.

{¶11} At a telephonic review hearing one day later, the trial court granted a six-month extension of temporary custody of M.D. to GCJFS, finding it to be in M.D.'s best interest.

**GCJFS Files For Permanent Custody and Termination of Parental Rights**

{¶12} GCJFS filed a motion for permanent custody, arguing that M.D. had been in its custody for 12 or more months out of a consecutive 22-month period and that an award of permanent custody to GCJFS would be in M.D.'s best interest.

{¶13} The GAL also filed her report and recommendations, which noted there were concerns, particularly if M.D. were to transition to a new location/foster home, as to M.D.'s manipulative or evasive behavior with any agency staff offering M.D. assistance, his lack of control of bowel/bladder without any known diagnosis, his not receiving in-

4

depth mental health services, his foraging/gluttony of food, and his lack of social activities with friends. She recommended that M.D. stay in his current foster placement with Kelly Bass ("Ms. Bass") due to improvements in his behaviors, his school performance, and the defined childhood boundaries while in the care of the foster home and that M.D. should be informed of changes as he ages. S.D. had no visitation with M.D. at the time, and the GAL recommended that if permanent custody occurs, it be at the discretion of the foster mother/adoptive family.

### The Permanent Custody Hearing

{¶14} On November 4, 2021, the trial court held a permanent custody/termination of parental rights hearing at which GCJFS presented the following witnesses to provide testimony: Ms. Bass, Dr. Mekota, the GAL, Jodi Miller ("Ms. Miller"), a GCJFS Kinship Navigator, and Rita Wren ("Ms. Wren"), a GCJFS caseworker.

#### *The Caseworker*

{¶15} Ms. Wren testified to the concerns identified for M.D. and S.D. when the case plan was first implemented, which included M.D.'s behaviors, his post-traumatic stress disorder ("PTSD"), and his depression, as well as S.D.'s substance abuse, her mental health, her non-compliance with medical management, her suicidal ideations, her hospitalizations, and the impact of her mental health. Ms. Wren reviewed the implementation of the case plan for S.D. and M.D.

{¶16} In regard to S.D., Ms. Wren testified that in December 2019, S.D. had been hospitalized due to suicidal ideation and threatening to drink bleach. GCJFS later learned of a separate suicidal ideation episode in which M.D. intervened and removed a knife from S.D. with which she was threatening to kill herself. After S.D. was psychologically

5

evaluated, it was recommended she continue services with the NORD center. S.D. admitted to Ms. Wren in February and in the month prior to the hearing that she was non-compliant with medication. She also relapsed in her alcohol addiction in January.

{¶17} Ms. Wren further testified that as of the date of the hearing, S.D. was case compliant with the exception of non-compliance with her prescription medication. At the outset of the case, S.D. did not have stable housing; however, she was able to obtain stable housing through Lorain County Public Housing. S.D. also struggled with employment and worked for a community college, a grocery store, and then McDonalds before returning to employment at the grocery store. Ms. Wren noted that Dr. Mekota recommended M.D. be placed in a therapeutic foster home.

{¶18} Based upon S.D.'s case plan progress and the recommendations of Dr. Mekota, S.D.'s substance abuse history, her parenting history, and her current mental health diagnosis, which is treated by medication, Ms. Wren opined that she did not feel reunification was possible at this time.

{¶19} On cross examination, Ms. Wren testified that S.D. was compliant in the case plan. She received substance abuse and mental health treatment, including a three-day/week program, an intensive outpatient program, and AA meetings. She has been sober since January 2021, received the Vivitrol shot to help her address her alcohol use and cravings, and participated in individual counseling. She has not had a mental health crisis/incident since 2019. S.D. has worked with a parenting coach, maintained employment, participated in weekly supervised visits with M.D., and obtained stable housing.

6

{¶20} Ms. Wren testified that GCJFS' main concern was S.D.'s parental capacities because she was never M.D.'s primary caregiver. S.D. never enrolled him in school. She never sought mental health treatment for M.D. when he suffered suicidal ideation and instead sent him to his sister's care, and she demonstrated no insight into how to care for M.D. and his behavioral issues. Ms. Wren reviewed that until M.D. was seven years old, he lived with his maternal grandmother, Mary S., and with S.D. and that Mary S. was the primary caregiver.

{¶21} In regard to M.D., Ms. Wren testified that he has been in the custody of GCJFS for 12 months out of a consecutive 22-month period. She reviewed that he has a history of self-harm/self-threatening behavior, PTSD, and depression. When he was living with S.D., he threatened to hang himself. S.D. did not engage any health services and sent M.D. to live with his sister. Mary S. could not be considered for a long-term placement because a grandson who lives with her sexually and physically abused M.D.

{¶22} Ms. Wren also reviewed M.D.'s various placements, which began with GCJFS receiving temporary custody from Latisha E. after she could not handle M.D.'s behaviors. He was then placed in the therapeutic foster home of Ms. Bass until he was moved to a kinship placement with the maternal great-uncle and his wife in Illinois. The Illinois relatives similarly had problems with M.D.'s behavior, and he was moved to a new kinship placement with his one of his sisters, Destiny A. Destiny A.'s home study was denied, and M.D. was then presented to Family and Children First Council ("FCFC"), which is a partnership of state and local government that helps families who are in need of multiple services.

7

**{¶23}** One of FCFC's recommendations was a 30-day stabilization program with the Village Network, a behavioral health nonprofit organization that provides treatment for children to transition from disruptive environments to permanent, stable homes. From there, M.D. was placed in his first therapeutic foster home with Ms. Bass.

**{¶24}** Ms. Wren testified that M.D. has a strong relationship with Ms. Bass. He is doing well in school, and, for the first time, he has stability in a home. M.D. has stated to her that he would like to live with his mother, but he knows he cannot.

### *The Kinship Navigator*

**{¶25}** Ms. Miller testified to the kindship placements she attempted for placement of M.D. with a family member. In addition to the placements that were displaced, Ms. Miller also contacted or attempted to contact nine other family members who either failed to respond or chose not to be considered as a placement option.

### *The Neuropsychologist's Forensic Review and Evaluation*

**{¶26}** Dr. Mekota conducted a neuropsychological evaluation of S.D. upon recommendation by GCJFS and testified in regard to his evaluation and report. He explained that he conducted a clinical interview with S.D., as well as interviews with collateral sources, including GCJFS, Ms. Bass, and M.D. Dr. Mekota administered a number of psychological and neuropsychological standardized measures, such as an adult intelligence scale, memory assessment, academic achievement assessment, measures of executive, memory, and language functions, attention, visual, and visuospatial abilities, and processing speed. He also reviewed S.D.'s medical history, which included GCJFS' intake and assessment forms, hospital records, a family genogram, a neurosequential model of therapeutics pertaining to M.D., multiple

8

documentation from LACADA, where S.D. received mental health and substance related treatment, records from the NORD Center, a social history from GCJFS, and a report from S.D.'s intensive outpatient care.

{¶27} Based on S.D.'s records from the NORD Center, Dr. Mekota learned that in May 2012, S.D. expressed suicidal ideation. She expressed feeling overwhelmed "trying to take care of her son, take care of her mother's house, and trying to take care of her boyfriend by sending him money." She also described frequent alcohol abuse behaviors and multiple binges with blackouts. She returned several years later, in 2017, presenting with an exacerbation of depressive symptoms. She had a reported history of criminal charges of child endangerment, domestic violence, attempted arson, obstruction of official business, and menacing. S.D. also disclosed a medical overdose with Trazodone that occurred in 2002 and reported a history of domestic violence victimization and perpetration towards partners. She returned to the NORD Center in March 2019, presenting with suicidal ideation and homicidal thoughts toward her nephew, who allegedly molested M.D.

{¶28} After M.D. expressed suicidal ideation in 2019, Dr. Mekota notes GCJFS recommended individual counseling. In addition, M.D.'s records indicated that he had two prior suicide attempts. Latisha E. failed to bring M.D. to three scheduled counseling appointments. In August 2019, GCJFS conducted another intake that involved S.D. expressing suicide ideation with a knife and bleach.

{¶29} Dr. Mekota also discussed a 2020 LACADA report documenting slow progress in treatment and its referral of S.D. to other mental health services. In January 2021, LACADA reports indicated S.D. only participated in her treatment with prompting,

9

demonstrated low comprehension, and struggled with relating to situations. S.D.'s sobriety date was documented as January 18, 2021.

{¶30} Dr. Mekota summarized his evaluation findings, noting that a review of her pattern of performance revealed an individual of borderline intellectual functioning, which is the fourth or lowest percentile. He concluded that S.D. may be prone to distractibility and has difficulty in multi-tasking, decision-making, and developing novel solutions to problems. Dr. Mekota reviewed that S.D. has a history of multiple, severe mental health disorders, including bipolar disorder and borderline personality disorder and that she is prone to depressive disorder. Her more acute or disruptive problematic symptoms and behaviors have typically occurred in the context of alcohol abuse, which she historically utilized as her primary coping behavior.

{¶31} Dr. Mekota opined that based on a reasonable degree of psychological certainty, reunification with S.D. would not be in M.D.'s best interest. Dr. Mekota did not consider S.D. capable of providing M.D. with a stable, secure, and cultivating home environment. Dr. Mekota further believed that M.D. has a variety of behavioral concerns that need a high degree of care, and most fundamentally, he is in need of stability and structure. Dr. Mekota recommended a therapeutic foster care placement, such as with Ms. Bass, and that family therapeutic visits between S.D. and M.D. should continue.

### The Foster Mother and the GAL

{¶32} Ms. Bass, M.D.'s foster mother, also testified. M.D. resided with her and her son. Ms. Bass had been a certified foster parent with the state of Ohio for two years and three months at the time of the hearing. She testified that she feels well-bonded with

10

M.D. and that she is aware of his needs, i.e., structure, discipline, love, and friendship. She did not intend to adopt but would continue to care for M.D. until he is 18 years of age.

{¶33} The GAL testified that M.D.'s behaviors - bed-wetting and belligerence - were improving with Ms. Bass and that Ms. Bass was meeting his basic needs. During the course of her investigation, the GAL was able to ascertain that M.D. was S.D.'s caregiver, and he would assume a parental role. M.D. shared with her that he would like to remain with Ms. Bass because S.D. cannot care for him, and he does not want to be in a residential home. The GAL opined that S.D. would not be able to provide a safe and stable environment for M.D. based on his intelligence and manipulative behaviors, as well as S.D.'s various boyfriends and lack of stability. She recommended that permanent custody be granted to GCJFS.

### Permanent Custody is Granted to GCJFS

{¶34} The trial court found, pursuant to R.C. 2151.414(B)(1)(d), by clear and convincing evidence, that M.D. has been in the temporary custody of GCJFS for 12 or more months of a consecutive 22-month period; thus, the first prong of the permanent custody analysis was satisfied.

{¶35} Next, the trial court considered the best interest factors pursuant to R.C. 2151.414(D)(1). Firstly, pursuant to R.C. 2151.414(D)(1)(a), interactions/ interrelationships with parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child, the trial court found that M.D. has stable housing and an environment that provides consistent structure, discipline, and love, as well as a positive bond with his foster mother, Ms. Bass. Further, although M.D. wants to maintain a relationship with S.D., her cognitive functioning, recent

11

relapse into alcohol where there is a history of alcohol use, and trouble managing medication is not beneficial to M.D. and his mental and physical development. Kinship placements were unsuccessful due to M.D.'s behavior; however, Ms. Bass has managed his behavior in a constructive and positive manner. Thus, the court concluded that M.D. has had the most positive development in GCJFS' temporary care while placed with Ms. Bass and that permanent custody of M.D. favors GCJFS.

{¶36} Secondly, the court considered R.C. 2151.414(D)(1)(b), the wishes of the child, and noted that while M.D. wants a relationship with S.D., he needs stability, discipline, and love, all of which is being provided for in Ms. Bass' care. Any future relationship and contact between M.D. and S.D. needs to be therapeutic. While a relationship with S.D. may be appropriate, permanent custody favors GCJFS.

{¶37} Thirdly, the court considered R.C. 2151.414(D)(1)(c), the custodial history of the child. Since M.D. has been in the temporary custody of GCJFS for 12 or more months out of a consecutive 22-month period, the trial court found the custodial history of M.D. favors permanent custody with GCJFS.

{¶38} Lastly, the court considered R.C. 2151.414(D)(1)(d), the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody. The trial court found that M.D. has a history of behavioral issues, as well as PTSD and depression, which must be addressed through counseling and in an environment that allows M.D. to express himself in a positive manner. Further, the court found S.D.'s continued struggles to manage her medication and her recent relapse with alcohol did not allow a scenario where M.D. could be reunified with her. The structure, discipline, and loving environment required to grow and mature

12

as an individual was being satisfied with M.D.'s foster parent. The court recognized that M.D. wants a relationship with his mother and that this should be pursued. The court concluded that a legally secure permanent placement of M.D. could only be achieved with a grant of permanent custody to GCJFS.

{¶39} The court granted permanent custody of M.D. to GCJFS and terminated S.D.'s parental rights.

{¶40} S.D. appeals, raising one assignment of error:

{¶41} "The trial court erred by granting permanent custody of M.D. to the Geauga County Department of Jobs [sic] and Family Services contrary to the manifest weight of the evidence."

**Standard of Review**

{¶42} It is well established that a parent's right to raise a child is an essential and basic civil right." (Citations omitted.) *In re T.B.*, 11th Dist. Lake No. 2008-L-055, 2008-Ohio-4415, ¶ 29. "The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case." (Citations omitted.) *Id.* The Ohio Supreme Court has determined, based upon these principles, that a parent must be afforded every procedural and substantive protection the law allows. (Citations omitted.) *Id.*

{¶43} R.C. 2151.414 sets forth the guidelines that a juvenile court must follow when deciding a motion for permanent custody. *Id.* at ¶ 30. R.C. 2151.414(A)(1) mandates that the juvenile court must schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or

13

Case No. 2021-G-0038

private child placing agency that has temporary custody of the child or has placed the child in long-term foster care. *Id.*

{¶44} Following the hearing, R.C. 2151.414(B)(1) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency and that any of the following apply: "(d) The child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period * * *." *Id.* at ¶ 31.

{¶45} Therefore, R.C. 2151.414(B)(1) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. *Id.* at ¶ 32. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child. *Id.*

{¶46} Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. *Id.* at ¶ 34. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates that the juvenile court must consider all relevant factors, including but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (b) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial

14

history of the child (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. *Id.*

**{¶47}** ""The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.""" *Id.* at ¶ 35, quoting *In re Lambert*, 11th Dist. Geauga No. 2007-G-2751, 2007-Ohio-2857, ¶ 75, quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).

**{¶48}** ""An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence."" *Id.* at ¶ 36, quoting *Lambert* at ¶ 75, quoting *In re Jacobs*, 11th Dist. Geauga No. 99-G-2231, 2000 WL 1227296, *4 (Aug. 25, 2000).

**Manifest Weight of the Evidence**

**{¶49}** In her sole assignment of error, S.D. contends that the trial court erred in granting permanent custody of M.D. to GCJFS because it is contrary to the manifest weight of the evidence. More specifically, she contends a legally secure permanent placement for M.D. could have been achieved without a grant of permanent custody to GCJFS.

{¶50} "In cases involving the termination of parental rights, an appellate court applies the civil manifest weight of the evidence standard of review." *In re M.B.*, 11th Dist. Ashtabula No. 2017-A-0024, 2017-Ohio-7293, ¶ 37. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Id.*, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 50 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶51} It is well-settled that when assessing the credibility of witnesses, the choice between the credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact. Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. *State v. Rice*, 2019-Ohio-1415, 135 N.E.3d 309, ¶ 84 (11th Dist.).

{¶52} As demonstrated by our lengthy review of this case, the trial court's finding that a legally permanent placement cannot be secured without a grant of permanent custody to GCJFS is supported by competent, credible evidence. The crux of this troubling case is that S.D. has substantially complied with GCJFS' case plan; however, she continues to struggle with her sobriety and prescription medication compliance, and she has demonstrated a lack of parental capacities. From the evidence presented, there is no indication she will ever demonstrate the parental abilities she needs to parent a child with the type of behavioral issues M.D. faces and be able to provide a secure, stable, and nurturing environment.

16

{¶53} Every witness testified to M.D.'s need to have a stable and safe environment and that Ms. Bass fulfilled that need. All recommended that permanent custody should be granted to GCJFS. The evidence presented also revealed that S.D. has continually relied on others to care for M.D., admitted that M.D. is a dependent child, and supported legal custody of M.D. in various kinship placements. Every kinship placement, however, resulted in behavioral issues and struggles that resulted in M.D.'s displacement. Moreover, the evidence reflected that in the past, Mary S. was M.D.'s primary caregiver and that S.D. failed to address M.D.'s mental health needs when he expressed suicidal ideations – she instead relinquished custody to Latisha E. The evidence also demonstrated that M.D. has never had a secure and stable home life and that he has suffered behaviorally as a result. While M.D. expressed his love for his mother, he also recognized that she cannot care for him and confided in the GAL that he wished to remain with Ms. Bass.

{¶54} While S.D. argues she is case plan compliant, she had an alcohol relapse in January 2021 and was not compliant with her prescription medicine in February to May, as well as the month prior to the hearing. The recent relapse and short-term consistency in medication compliance undercuts her argument and raises serious doubt as to her ability to sustain long-term compliance with treatment and sobriety. When this is taken in consideration with her lack of parental capacities, there is little evidence that S.D. will be able to provide a stable and nurturing environment for her son.

{¶55} Finding there is competent, credible evidence supporting the trial court's determination that a legally secure permanent placement could not be achieved without

17

a grant of permanent custody of M.D. to GCJFS, S.D.'s sole assignment of error is without merit.

{¶56} The judgment of the Geauga County Court of Common Pleas, Juvenile Division, is affirmed.

MATT LYNCH, J.,

JOHN J. EKLUND, J.,

concur.

18

Case No. 2021-G-0038