[Cite as *In re S.W.*, 2018-Ohio-1672.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| S.W., NEGLECTED CHILD | : | |
| | : | **CASE NO. 2017-A-0089** |
| | : | |
| | : | |

Civil Appeal from the Ashtabula County Juvenile Court, Case No. 2016 JC 0111.

Judgment: Affirmed.

*Nicholas A. Iarocci*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047, and *Margaret A. Draper*, Assistant Prosecutor, Ashtabula County Children Services Board, 3914 C Court, Ashtabula, OH 44004 (For Appellee, Ashtabula County Children Services Board).

*Eric J. Cherry*, The Law Offices of Eric J. Cherry, 1801 Euclid Avenue, Suite A092, Cleveland, OH 44115 (For Appellant, Kenneth Wiley).

DIANE V. GRENDELL, J.

{¶1} Appellant, Kenneth Wiley, appeals from the judgment of the Ashtabula County Juvenile Court granting permanent custody of his child, S.W., to appellee, the Ashtabula County Children Services Board (ACCSB). The issues to be determined in this case are whether a children services agency made reasonable efforts to return a child to her home when the parent has been imprisoned and on post-release control, was unable to exercise visitation, and had not seen the child for several years; whether a child can be reunited with a parent in a reasonable time under the same

circumstances; and whether trial counsel is ineffective by failing to call a witness whose potential testimony is unspecified, counsel's inaccurate objection caused the court to enter an additional finding against his client, and counsel was alleged to have provided insufficient argument as to the issue of abandonment. For the following reasons, we affirm the decision of the court below.

{¶2} Wiley is the biological father of S.W., born January 12, 2009. Her biological mother is Amanda Callaghan.

{¶3} On April 28, 2016, ACCSB requested ex parte emergency temporary custody of S.W., which was granted through a Magistrate's Order on that date.

{¶4} ACCSB's Verified Complaint for Temporary Custody was filed on April 29, 2016, alleging that S.W. and her sibling, J.V., were neglected. It contended that their mother, Callaghan, was using drugs, there was little food in the home, and the children reported caring for themselves and having no adult present in the home during the night.

{¶5} On June 9, 2016, Wiley, who requested reunification services, was added to the case plan in relation to S.W. Goals added included attending parenting classes and completing post-release control, which arose from his imprisonment on a Child Endangering conviction. The case plan also provided for supervised visitation.

{¶6} A Magistrate's Decision was issued on June 29, 2016, which noted that Wiley had stipulated to neglect by Callaghan. S.W. was found to be a neglected child, which finding was subsequently adopted by the trial court.

{¶7} Following a dispositional hearing, a Magistrate's Decision was issued on July 22, 2016, in which the court found that a return home would be contrary to S.W.'s best interest, that Wiley was on post-release control and there was a no contact order

with S.W., and that reasonable efforts were made to return the child home. This was adopted by the trial court.

{¶8} A semiannual administrative review document filed by ACCSB on October 27, 2016, noted that all supervised contact had to be approved by the Adult Parole Authority and that the APA "is not recommending contact between [Wiley and S.W.] due to fears that have been expressed by [S.W.]."

{¶9} ACCSB filed a Motion Requesting Modification of Temporary Custody to Permanent Custody on February 9, 2017.

{¶10} On April 14, 2017, Wiley filed a Motion for Visitation, noting that he had completed post-release control and would now be able to visit with S.W.

{¶11} An Amended Guardian Ad Litem Report and Recommendation was filed on May 30, 2017. The GAL recommended that permanent custody be granted to ACCSB, noting that both children are doing well in their foster care placement. She concluded that Wiley "does not have the ability to properly care for" S.W.

{¶12} A hearing on the motion for permanent custody was held on June 1, 2017. The following testimony was presented:

{¶13} Jenelle Schafer, an ongoing caseworker for ACCSB, has worked with S.W. and her family since May 2016. Callaghan did not meet any of the goals provided in her case plan. According to Schafer, Wiley's case plan required maintaining housing for S.W., attending parenting classes, finishing any "issues that he had with his parole," and to have no additional criminal involvement. It also included counseling and addressing anger management concerns. Wiley completed a mental health assessment, attended counseling and parenting classes, and followed recommendations resulting from the assessment.

3

**{¶14}** Schafer testified that Wiley had been convicted of child endangering in relation to J.V. Wiley did not have contact with S.W. as it was recommended by the Adult Parole Authority that he not have unsupervised visits with her and could not have supervised visits without their approval. Wiley has purchased items for S.W., including toys but they were not given to her because ACCSB was waiting until he exercised visitation.

**{¶15}** Schafer met with Wiley approximately 11 times and noted multiple occasions when he became angry. In September 2016, he was "yelling and was throwing things around his living room and slamming furniture around and boxes." In March 2017, he came into the agency, was yelling, and made a comment that "he feels as though the Agency is going to force him into doing something that he's going to regret and he's ultimately going to be incarcerated for." He made similar comments at the agency in April 2017. Eventually, she would no longer go to his residence by herself.

**{¶16}** Schafer testified that she was unaware of Wiley completing anger management classes but that he had completed other case plan requirements and was successfully discharged from parole around February 27, 2017.

**{¶17}** Schafer opined that J.V. and S.W. were doing well in the foster home where they have lived since April 2016. They are bonded with each other and interact well with their foster parents, who are willing to adopt them. She believed it would not be in their best interest to be separated. Schafer was aware that an aunt and maternal grandmother had contacted ACCSB for visitation but had not requested custody.

**{¶18}** Amy Bell, Wiley's girlfriend, lives with Wiley and has never been afraid of him. She was present when Schafer visited and did not see Wiley yell at her or throw

4

things, aside from tossing a bag of school supplies.  He sometimes became upset when discussing matters with the agency.

**{¶19}** Wiley testified that he last saw S.W. in January 2012.   He denied committing the crime of Child Endangering but conceded that he was convicted of it, based on evidence that he grabbed J.V., S.W.'s brother, by his throat and picked him up.  One of the conditions of his post-release control was that he not have contact with S.W.

**{¶20}**  Wiley testified that he was released from prison April 25, 2015, and was designated to be on post-release control for one year, but was not successfully terminated until February 2017.  He stated that the extension of parole "wasn't [his] fault" and was due to e-mail communication errors.  He attended counseling relating to anger management and had been doing so for several months.  He also completed parenting classes.   He tried to seek supervised visits but was prevented from doing so when the therapist said S.W. was afraid of him.  He believed S.W. is scared because of negative things her mother told her.

**{¶21}** The GAL, Ariana Tarighati, testified regarding the closeness of the children and the negative impact of separating them.   Tarighati testified that S.W. conveyed she did not want to see Wiley and "you could just see she was afraid" when discussing him.

**{¶22}**  On July 6, 2017, a Magistrate's Decision was filed, granting permanent custody to ACCSB.  The magistrate concluded that S.W. had been abandoned and that she could not be placed with either parent within a reasonable time, applying multiple R.C. 2151.414(E) factors.

**{¶23}**  Wiley filed Objections to Magistrate's Decision on July 19, 2017.

5

{¶24} The trial court issued a December 12, 2017 Judgment Entry, finding no merit in the objections. It adopted the findings of the magistrate, but amended the decision to include an additional R.C. 2151.414(E) factor. It found that the children "cannot be placed with either parent within a reasonable time or should not be placed with either parent and that ACCSB has made reasonable efforts as set forth above." It ordered that parental rights be terminated and permanent custody be granted to ACCSB.

{¶25} Wiley timely appeals and raises the following assignments of error:

{¶26} "[1.] The trial court erred in failing to require the agency to make reasonable efforts to reunify S.W. with her father.

{¶27} "[2.] The agency failed to demonstrate by clear and convincing evidence that S.W. could not be placed with Mr. Wiley within a reasonable time.

{¶28} "[3.] Mr. Wiley's counsel ineffectively represented him throughout the proceedings."

{¶29} "[P]arents who are suitable persons have a 'paramount' right to the custody of their minor children." (Citations omitted.) *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990). The termination of a parent's rights with respect to a child, however, "is nevertheless expressly sanctioned * * * when it is necessary for the 'welfare' of the child." *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979). "[T]he Fundamental or Primary inquiry at the dispositional phase of these juvenile proceedings is not whether the parents * * * are either fit or unfit," rather, it is "the best interests and welfare of that child [that] are of paramount importance." *Id.* at 106. Permanent custody actions are not meant to punish the parents. Permanent custody actions are meant to protect the children.

6

{¶30} "R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody." *In re Krems*, 11th Dist. Geauga No. 2003-G-2535, 2004-Ohio-2449, ¶ 33. The court must initially determine whether one of the four circumstances set forth in R.C. 2151.414(B)(1)(a) through (d) is present. In this case, the circumstances applied by the court were: (a) that the child has not been in the custody of the agency for twelve or more months of a consecutive twenty-two-month period and "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents" and (b) the child is abandoned.

{¶31} Following a determination that one of the four circumstances under R.C. 2151.414(B)(1)(a) through (d) applies, the court must determine, "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody." R.C. 2151.414(B)(1).

{¶32} In cases involving the termination of parental rights, an appellate court applies the civil manifest weight of the evidence standard of review. *In re M.B.*, 11th Dist. Ashtabula No. 2017-A-0024, 2017-Ohio-7293, ¶ 37.

{¶33} In his first assignment of error, Wiley argues that reasonable efforts were not made to reunify him with S.W., pursuant to R.C. 2151.419.

{¶34} R.C. 2151.419(A)(1) provides that when a child is removed from a home or continues to be removed, the children services agency must show it made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home."

7

**{¶35}** As the Ohio Supreme Court has held, "R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 43. Aside from in the case of some statutory exceptions, however, "the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights" and, "[i]f the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.*; *In re Lambert*, 11th Dist. Geauga No. 2007-G-2751, 2007-Ohio-2857, ¶ 59-62.

**{¶36}** "In determining whether the agency made reasonable efforts [pursuant to R.C. 2151.419(A)(1)] to prevent the removal of the child from the home, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." (Citation omitted.) *In re Elliott,* 11th Dist. Ashtabula No. 2005-A-0018, 2006-Ohio-738, ¶ 16.

**{¶37}** As an initial matter, Wiley argues that certain exceptions to the reasonable efforts finding do not apply in this case, specifically contending that his conviction is not of the type permitting an exception and that he did not abandon S.W. *See* R.C. 2151.419(A)(2)(a)(iii) and (d). However, the lower court did not apply these exceptions in relation to reasonable efforts and specifically made a finding that reasonable efforts were made. As that finding was proper, it is irrelevant whether these exceptions apply.

**{¶38}** As discussed above, a reasonable efforts finding made "at some point after the child came under the temporary care of the agency" satisfies R.C. 2151.419(A)(1). (Citation omitted.) *In re B.R.C.,* 11th Dist. Portage Nos. 2013-P-0059 and 2013-P-0060, 2014-Ohio-69, ¶ 69. Such a finding was made following a July 22,

8

2016 dispositional hearing. Furthermore, the finding in the lower court's order terminating parental rights that reasonable efforts were made to prevent removal or eliminate the continued removal of S.W. was supported by the record.

{¶39} It is evident from the case plan that ACCSB did provide services to Wiley, as well as the opportunity to complete elements of the plan. However, the main concern was that, at the time of the permanent custody hearing, Wiley had not seen S.W. since 2012. While it is accurate that this was primarily due to his incarceration, the terms of his post-release control which included a no contact order, and S.W.'s expressed fear of seeing him, these concerns were created by Wiley's conduct of abusing S.W.'s brother. The lack of a relationship between S.W. and Wiley, as well as her fear of him, provided justification for failing to place S.W. with him and does not demonstrate a lack of reasonable efforts by ACCSB.

{¶40} ACCSB also expressed concerns that Wiley did not take sufficient steps to either request the no-contact order be lifted or attempt to have supervised visitation. According to a letter from Wiley's parole supervisor, such visitation would be permitted provided he recommended someone to supervise visitation and approvals were obtained. It is unclear what steps Wiley took toward achieving this goal. Wiley testified that when he was first on post-release control he made no efforts to contact S.W. because of the no-contact order, but was unclear when he began requesting visitation. It is also evident from his testimony that he was not released from post-release control until approximately ten months after its scheduled completion, which also contributed to the no-contact order remaining in place. In any event, ACCSB had no control over the no-contact order and its case plan did initially permit supervised visitation, demonstrating that it was not ACCSB's lack of efforts that caused Wiley to be unable to

9

see his daughter. *See In re S.D.*, 11th Dist. Ashtabula No. 2014-A-0063, 2015-Ohio-354, ¶ 44 ("'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible.") (citation omitted).

**{¶41}** Wiley emphasizes that he completed all of his case plan goals, and that ACCSB intended only to create the "appearance of compliance" regarding reasonable efforts and had already concluded he could not be granted custody. As explained above, however, ACCSB had little control over the fact that Wiley, by his own acts, was either unavailable or not permitted to see S.W. over the course of several years, and that she exhibited a fear of him and had formed no relationship with him. Further, her fear of Wiley was buttressed by ACCSB employees' observation of him exhibiting agitated and angry conduct toward them, with Schafer testifying she also had a fear of him and would not continue to interact with him on her own.

**{¶42}** Finally, Wiley argues that ACCSB failed to investigate other suitable relatives to be granted custody of S.W.

**{¶43}** Wiley concedes that there is no duty for the juvenile court to "find by clear and convincing evidence that no suitable relative was available for placement." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64. The duty of ACCSB to use reasonable efforts to avoid removal of the child does not extend to making a reasonable effort to place a child with relatives. *In re Johnston*, 11th Dist. Ashtabula No. 2008-A-0015, 2008-Ohio-3603, ¶ 56.

**{¶44}** Moreover, Schafer testified that placement with a relative was not considered because no relative came forward with such a request. While an aunt and

10

maternal grandmother sought visitation, they did not request custody or adoption. Given the foregoing, we do not find any error as to this issue.

{¶45} The first assignment of error is without merit.

{¶46} In his second assignment of error, Wiley argues that the agency failed to demonstrate by clear and convincing evidence that S.W. could not be placed with him within a reasonable time, pursuant to R.C. 2151.414(E).

{¶47} To determine that a child cannot be placed with the parents within a reasonable time or should not be placed with them, the court must find, by clear and convincing evidence, that at least *one* of the factors in R.C. 2151.414(E)(1)-(16) is present.

{¶48} We initially note that the lower court applied the (E)(6) and (E)(7)(c) factors, which relate to convictions for certain criminal offenses. Wiley argues, and ACCSB concedes, that his offense is not one listed in these provisions and thus, these factors do not apply. However, only one factor needs to be present to reach a finding that S.W. could not be placed with Wiley within a reasonable time or should not be placed with him and several others were found to be present.

{¶49} As to the remaining factors, first, the lower court found that Wiley "demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child." R.C. 2151.414(E)(4). Wiley contends that he was not able to visit or communicate with S.W., rendering this factor inapplicable. As noted above, there was at least some conflicting testimony as to the efforts made by Wiley to visit with S.W., relating to efforts to

11

exercise supervised visitation and the cause of his extended period of post-release control.   It was reasonable for the court to consider and apply this factor.

{¶50}   The court also found (E)(5) applicable, which provides for consideration of whether a parent "is incarcerated for an offense committed against the child or sibling of a child."  Wiley argues that this is inapplicable since he was no longer incarcerated for Child Endangering at the time of the permanent custody hearing.  We agree that the court erred in finding that this factor applied, given that he was not incarcerated when the hearing took place.   Regardless, this error resulted in no harm to Wiley.  It was appropriate for the court to consider incarceration under (E)(16), which allows for application of "[a]ny other factor the court considers relevant."

{¶51}   Under (E)(10), the court found that Wiley abandoned S.W.  Wiley argues that this factor should not have been applied since he was unable to visit with S.W. due to his imprisonment and subsequent post-release control conditions.  The trial court was required to find that only *one* of the R.C. 2151.414(E)(1)-(16) factors was present to rule that S.W. could not be placed with Wiley within a reasonable time.  Since abandonment was not the only basis for the trial court's decision, it is unnecessary to determine the applicability of this factor.

{¶52}   Finally, the court found that (E)(14) was relevant, which applies when a parent, "for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect."  Again, the analysis discussed above applies here.  While there may be some dispute about the meaning of "unwilling," Wiley's conduct led to his inability to parent S.W.  Further, concerns with his continued anger problems were relevant to his willingness to prevent S.W. suffering from

emotional or mental neglect.

**{¶53}** Based on the foregoing, there were multiple factors to support the trial court's determination that S.W. could not be returned to Wiley within a reasonable time or should not be placed with him.

**{¶54}** The second assignment of error is without merit.

**{¶55}** In his third assignment of error, Wiley argues that trial counsel's ineffective representation caused the lower court's award of permanent custody to ACCSB.

**{¶56}** "The test applied to evaluate a claim of ineffective assistance of counsel in a proceeding to terminate parental rights is the two-step test of *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674." *In re L.M.*, 11th Dist. Ashtabula No. 2010-A-0058, 2011-Ohio-1585, ¶ 57. Accordingly, Wiley must demonstrate "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland* at 687-688.

**{¶57}** Wiley first argues that trial counsel was ineffective by failing to call his therapist as a witness since the therapist could have opined about Wiley's progress and when he would be approved to have "residential interactions with children."

**{¶58}** This court has held that the "decision to call, or not to call, a certain witness to the stand is subject to the strong presumption that the decision might be considered sound trial strategy" since such a decision is a tactical one. *In re A.L.A.*, 11th Dist. Lake Nos. 2011-L-020 and 2011-L-021, 2011-Ohio-3124, ¶ 117*.*

**{¶59}** Given that the decision to call a witness to testify is a strategic one, we do

13

not find counsel was ineffective for his failure to call the therapist. *Id.* at ¶ 118. Moreover, since there is no evidence in the record to indicate how the witness would have testified if called, there can be no showing of prejudice. *Id.* Wiley opines that if the therapist's testimony would have been unfavorable, ACCSB would have called the therapist as a witness. We reject this argument, as it is based on mere speculation and unsupported by the record.

**{¶60}** Wiley also argues that trial counsel was ineffective by objecting to a criterion that was not provided by the magistrate in support of the conclusion that S.W. could not be placed with either of her parents within a reasonable time.

**{¶61}** The magistrate found that R.C. 2151.414(E)(6) did not apply to this case, but trial counsel argued in objections to the Magistrate's Decision that it improperly used that factor to support its decision. The court then considered this factor, which relates to Wiley's criminal conviction and posing an "ongoing danger" to S.W., and decided that the magistrate should have found it applicable. As we noted in the second assignment of error, this factor was improperly applied by the trial court.

**{¶62}** It was the trial court, not trial counsel, that improperly stated the applicability of this factor. Regardless of whether this action by counsel fell below an objective standard of reasonableness, however, we do not find that this prejudiced Wiley. As the trial court correctly noted in its judgment, R.C. 2151.414(E) sets forth multiple factors relating to whether the child can return home, but "[o]nly one of the multiple factors is required to be found." As described above, there were several factors here that justified a finding to terminate parental rights and no prejudice resulted.

**{¶63}** Finally, Wiley argues that trial counsel was ineffective by failing to present evidence to rebut the presumption of abandonment.

14

**{¶64}** Wiley fails to point to what additional evidence could have been presented as to this issue. The court had before it the testimony of Wiley and Schafer regarding the reasons why he was unable to visit with S.W., including the no contact order and S.W.'s fear of him, and it was able to consider whether that constituted abandonment. We decline to speculate about what additional evidence may have shown for the purposes of finding ineffective assistance of counsel. *State v. Cookingham*, 11th Dist. Ashtabula No. 2017-A-0023, 2017-Ohio-8362, ¶ 34.

**{¶65}** To the extent that Wiley argues counsel "nearly stipulated" to abandonment, this does not amount to actually doing so. Counsel's statement at the beginning of the hearing that Wiley had not seen his daughter "since the beginning of this case," is consistent with Wiley's own admission during his testimony.

**{¶66}** The third assignment of error is without merit.

**{¶67}** For the foregoing reasons, the judgment of the Ashtabula County Juvenile Court granting custody of S.W. to ACCSB, is affirmed. Costs to be taxed against appellant.

COLLEEN MARY O'TOOLE, J., concurs in judgment only,

THOMAS R. WRIGHT, P.J., concurs with a Concurring Opinion.

_____

THOMAS R. WRIGHT, P.J., concurs with a Concurring Opinion.

15

{¶68} Although I agree with the majority's conclusion that permanent custody in favor of the Agency was proper under R.C. 2151.414(B)(1)(a) based on other applicable factors, I write separately because I disagree with the trial court's conclusion that Wiley abandoned S.W. under R.C. 2151.414(E)(10) and R.C. 2151.414(B)(1)(b).

{¶69} Germane to Wiley's argument, R.C. 2151.414(E) states in part:

{¶70} "If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

{¶71} "* * *

{¶72} "(10) The parent has abandoned the child."

{¶73} Although abandonment is not defined by statute, R.C. 2151.011(C) states:

{¶74} "For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

{¶75} ""Abandonment" of a child has been defined as any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child.' *Baker v. Rose* (1970), 28 Ohio Misc. 200, 203, 270 N.E.2d 678, citing, *In re Masters* (1956), 165 Ohio St. 503, 505-506, 137 N.E.2d 752. In *Masters,* the Ohio Supreme Court adopted dictionary definitions of 'abandon' that included the concept of relinquishment 'with the intent of never again resuming or claiming one's rights or interests in.' Id., at 505, 137 N.E.2d 752. In accord, see *In re*

*Kronjaeger* (1957), 166 Ohio St. 172, 176-177, 140 N.E.2d 773. That definition of 'abandon' appears to remain in common usage today. The first definition of 'abandon' in Webster's Third New International Dictionary (G. & C. Merriam Company, Springfield, Massachusetts, 1969) is: 'to cease to assert or exercise an interest, right, or title to esp. with the intent of never again resuming or reasserting it.'

{¶76} "Because it is often difficult to prove intent, presumptions are often employed as an aid in establishing intent. For example, at common law, an actor is presumed to intend the reasonably foreseeable consequences of his act.

{¶77} "A presumption effectively reverses the burden of coming forward with evidence to support a proposition of fact, causing the fact to be deemed established unless sufficient proof is presented to rebut the presumption. Once the presumption is rebutted, however, the presumption disappears. *Evans v. National Life & Acc. Ins. Co.* (1986), 22 Ohio St.3d 87, 488 N.E.2d 1247, first paragraph of syllabus. Whether sufficient proof has been presented to rebut, or 'unseat,' a legal presumption is an issue of law for the court. *Beresford v. Stanley* (1898), 6 Ohio N.P. 38, 9 Ohio Dec. 134, 1898 WL 763." *In re Custody of C.E.,* 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913, ¶12-14.

{¶78} In *In re C.E.,* the children's mother fled the state out of fear for her safety and was gone approximately four months after her husband attacked her. The trial and appellate courts agreed that she sufficiently rebutted the presumption of abandonment based on the evidence that she did not intend to forego her parental rights, but only to seek safety following domestic abuse. *Id.* at ¶16.

{¶79} Here, Wiley testified that he did not directly contact S.W. in any manner or visit her because he was not allowed via the terms of his post-release control. He

17

explained he wanted to visit and requested visitation following his release from prison, but that he did not want to violate the terms of his post-release control and return to jail. His efforts at visitation thereafter were likewise rejected based on the advice of S.W.'s counselor, and the gifts and school supplies he purchased for S.W. and her brother were returned to him. Thus, he rebutted the presumption that he abandoned S.W.

{¶80} Instead of defining abandonment and addressing the facts rebutting the presumption of abandonment, the trial court appears to conclude that Wiley *voluntarily* abandoned S.W. under a "transferred intent" theory, i.e., Wiley had the intent to commit child endangering, and therefore he had the intent to abandon his child because incarceration was a foreseeable consequence. This application is not sanctioned.

{¶81} Notwithstanding, because abandonment was not the only basis for the trial court's conclusion that S.W. could not or should not be placed with Wiley within a reasonable time, the trial court's decision finding abandonment is not prejudicial.