[Cite as *In re T.Y.*, 2023-Ohio-317.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE T.Y. | : | |
| | : | No. 111997 |
| A Minor Child | : | |
| | : | |
| [Appeal by B.Y., Mother] | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 2, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD20906213

### *Appearances:*

Michael E. Stinn, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} Mother-appellant, B.Y. ("Mother"), appeals from the juvenile court's judgment granting permanent custody of her minor child, T.Y., to appellee, Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). Mother raises the following assignments of error for review:

1. The trial court's award of permanent custody of the child to CCDCFS is not in the best interest of the child. The child could be and should be returned to her mother's care within a reasonable time. The trial court's order granting permanent custody to CCDCFS should be reversed.

2. The trial court's consideration of matters that were not admitted into evidence denied the child's mother due process. Therefore, the trial court's order granting permanent custody of the child to CCDCFS should be reversed.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

{¶ 3} Mother is the biological parent of the minor child, T.Y. (d.o.b. 03/09/2007). The child's biological father, E.S., is deceased.

{¶ 4} On July 22, 2020, CCDCFS filed a complaint for temporary custody, alleging that T.Y. was dependent as defined in R.C. 2151.04(C). The complaint stemmed from a dispute between T.Y and Mother on July 10, 2020, that resulted in delinquency proceedings. In support of the complaint, CCDCFS alleged the following set of particulars:

1. On July 10, 2020, the child was committed to the emergency custody of CCDCFS by [a] magistrate. See Case No. DL-20105895.

2. The child has significant emotional and behavioral issues which mother is unable to adequately manage, and which compromises the safety of the child and other siblings in the home.

3. Mother is overwhelmed with the child's behavior and is currently unwilling to provide care for the child in the home.

4. Mother has five children, including T.Y., that were previously adjudicated neglected due in part to educational neglect and lack of

supervision and committed to the protective supervision of CCDCFS. See Case No. AD-19903326-30.

5. Father is deceased.

{¶ 5} Following a hearing held on September 15, 2020, the child was committed to the predispositional temporary custody of CCDCFS. Thereafter, Mother entered admissions to an amended complaint[1] and the court found the allegations were proven by clear and convincing evidence. Accordingly, T.Y. was "adjudicated to be dependent" on October 23, 2020.

{¶ 6} On November 4, 2020, the juvenile court committed T.Y. to the temporary custody of CCDCFS and approved a case plan for reunification. The case plan was developed by CCDCFS to address concerns with T.Y.'s behavior and the ongoing conflicts between Mother and T.Y. In pertinent part, the case plan required Mother to participate in counseling services with the child and to "work with [CCDCFS] and service providers on parenting skills."

{¶ 7} On May 21, 2021, CCDCFS filed a motion to extend T.Y.'s temporary custody for a period of six months pursuant to R.C. 2151.353(G), 2151.415(A)(6), 2151.415(D)(1), and Juv.R. 19. The extension was approved by the juvenile court on July 14, 2021.

{¶ 8} On December 9, 2021, CCDCFS filed a motion to modify the order of temporary custody to an order of permanent custody pursuant to R.C. 2151.413. The

---

[1] The amended complaint removed allegation No. 3, which alleged that Mother was overwhelmed and unwilling to care for the child.

motion was supported by the affidavit of CCDCFS social worker, Jillian Blackwell ("Blackwell"), who averred, in pertinent part:

> 7.  A case plan was filed with the Juvenile Court and approved which required that [Mother] engage in services to improve her parenting skills to be better able to manage the child's needs and to participate in counseling/therapy sessions with the child as recommended.
>
> 8.  Despite reasonable case planning and diligent efforts by CCDCFS to assist her in working toward reunification, Mother has failed to successfully complete services as referred and has failed to consistently engage in recommended services.
>
> 9.  Mother has failed to maintain consistent contact/visitation with the child.
>
> 10.  The conditions that led to the child's removal from the home have not been sufficiently resolved and continued risks prevent reunification of child with mother.
>
> 11.  Father is deceased.
>
> 12.  No relatives have been identified who are both willing and able to provide appropriate care for the child.

{¶ 9} On August 29, 2022, a hearing was held to address the agency's motion for permanent custody. At the hearing, Caprisha Sinkfield ("Sinkfield"), an extended-services worker employed by CCDCFS, testified that she was assigned to the child's case in December 2021. Sinkfield outlined her familiarity with the parties and explained the circumstances that caused the child to be removed from Mother's care in July 2020. According to Sinkfield, "the initial circumstances were a parenting conflict with [T.Y.] and her mom [and] concerns that there was some domestic violence happening between the two." (Tr. 9.)

**{¶ 10}** Once the child was placed in the temporary care of CCDCFS, a case plan for reunification was developed to assist Mother in addressing the issues that led to the child's removal. Sinkfield testified that the case-plan objectives required Mother to participate in a parenting-education program and to participate in recommended counseling services with T.Y. Despite the agency's efforts to assist Mother in addressing her issues, Mother failed to complete a parenting education course and did not successfully complete the counseling component of the case plan.

**{¶ 11}** Sinkfield confirmed that Mother attempted to participate in the required counseling with T.Y on two separate occasions. The first attempt at counseling occurred "at the beginning of 2021," but was discontinued because "[Mother] did not call in" to the virtual appointments. (Tr. 15.) The second attempt at counseling occurred after the motion for permanent custody was filed. Sinkfield explained that the counseling sessions were again discontinued due to Mother's failure to appear, stating:

> [I]t was kind of a repeat of no one calling in or miscommunication, so the counseling was stopped again.

(Tr. 16.) Sinkfield further clarified that Mother possessed all of the necessary information to contact the family counselor to resolve any technological issues she may have encountered when attempting to access the virtual sessions.

**{¶ 12}** Between February 2022 and the date of the permanent-custody hearing, Mother and T.Y. participated in approximately three or four counseling sessions together. Sinkfield testified that no additional progress has been made

towards the counseling component of the case plan since the last counseling session occurred. When the agency made additional attempts to reinitiate family counseling, T.Y. expressed that she "was not interested in doing it because * * * she didn't want to start counseling and mom [did] not call in, so she was kinda hesitant to start it." (Tr. 15-16.) Sinkfield testified that Mother also did not wish to continue with family counseling "just with her trouble calling in or having good dates." (Tr. 16.) Thus, while Sinkfield acknowledged that some progress had been made towards the counseling component of the case plan, she opined that Mother and T.Y. have not "gotten to a level where they can effectively communicate with each other." (Tr. 17-18.)

{¶ 13} Regarding Mother's interactions with the child, Sinkfield testified that Mother has frequently engaged in visitation and has had positive interactions with T.Y. during supervised visits. (Tr. 25.) T.Y. also shares a strong bond with her siblings and has positive interactions with them during visits at Mother's home. Nevertheless, when the agency began discussing the possibility of granting Mother unsupervised overnight visits, T.Y. expressed that she was unwilling to participate in overnight visits because she did not feel comfortable with Mother. T.Y. also expressed to the agency that she did not wish to return to Mother's home on a permanent basis. Sinkfield testified that T.Y. was "pretty adamant" about her wishes. (Tr. 25.)

{¶ 14} Sinkfield also provided extensive testimony concerning T.Y.'s current placement in a group home. Sinkfield stated that T.Y.'s behavior has improved and

that there have been "no concerns with her behavior other than kind of being a teenager and talking back here and there." (Tr. 14.) T.Y. is actively participating in individual and group counseling, is currently seeing a psychiatrist, and is beginning to open up and engage in the referred services.

{¶ 15} Finally, Sinkfield testified that the agency investigated suitable relatives for placement during the pendency of the temporary-custody order. Sinkfield explained that the agency attempted to explore the child's adult sister for placement but was unable to contact her. Additionally, although the child's paternal grandmother was previously approved for placement, T.Y. "expressed that she did not feel comfortable with going to legal custody of grandma." (Tr. 20.)

{¶ 16} Based on the foregoing, Sinkfield opined that permanent custody in favor of the agency was in the child's best interests. Sinkfield reiterated that Mother did not successfully address her case-plan objectives for counseling- and parenting-education and that the agency was concerned that the conflicts between Mother and T.Y. would resume if the child was returned to Mother's care.

{¶ 17} On cross-examination, Sinkfield confirmed that Mother currently has two minor children under her care and that the agency has no concerns with her ability to care for these children. Regarding the family-counseling component of the case plan, Sinkfield acknowledged that Mother's first attempt to engage in counseling with T.Y. was discontinued because Mother "was not calling in" and T.Y. no longer wished to participate. (Tr. 32.) Sinkfield further acknowledged that, according to Mother, the second attempt to engage in counseling with T.Y. was only

discontinued because Mother "was having technological issues" and could not call into the virtual sessions. (Tr. 32.) Finally, Sinkfield testified that she did not have "any safety concerns with the way that Mother is parenting her child." (Tr. 36.)

{¶ 18} At the close of trial, child's guardian ad litem, Paul Daher, Esq. (the "GAL"), was called as if on cross-examination by counsel for Mother. The GAL explained that the agency became involved in this matter following a physical altercation between Mother and T.Y. Mother initially expressed that she did not want to let T.Y. back into her home, accordingly T.Y. was placed into a group home in Youngstown, Ohio. The GAL reiterated the social worker's testimony that T.Y. has made significant emotional and behavioral progress while under the agency's care. The GAL explained that T.Y. is doing well in school, is participating in extracurricular activities, is taking her medication, and is engaged in counseling. Despite T.Y.'s individual progress, however, the GAL opined that the underlying issues between Mother and T.Y. have not been resolved and, therefore, he did not feel comfortable returning the child to Mother's care. The GAL explained his position as follows:

> It's just, there hasn't been enough consistency where a counselor says, hey, this is a good idea, and it's just unfortunate, but I think [T.Y.] will continue to have contact with her mother and her siblings. * * * And I would encourage it even though there is permanent custody, but I would encourage it.

(Tr. 43.)

{¶ 19} In a journal entry dated August 31, 2022, the juvenile court granted the agency's motion for permanent custody. The juvenile court found, by clear and

convincing evidence, that the child has been in the temporary custody of a public-services agency or private child-placing agency for 12 or more months of a consecutive 22-month period. The court further concluded that it is in the child's best interests to be place in the permanent custody of CCDCFS. In support of its best interests determination, the juvenile court made alternative findings pursuant to R.C. 2151.414(D)(1) and (D)(2).

{¶ 20} Mother now appeals from the juvenile court's judgment.

## II. Law and Analysis

### A. Standard of Review

{¶ 21} In the first assignment of error, Mother argues the juvenile court erred and abused its discretion in finding that clear and convincing evidence supported the decision to terminate her parental rights and grant permanent custody of the child to CCDCFS.

{¶ 22} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the

polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 23} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman,* 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14; *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock,* 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

## B. Permanent Custody Standard

{¶ 24} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this

statute authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.  R.C. 2151.414(B)(1)(a)-(e).

{¶ 25} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 26} "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.,* 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

"'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.*, 8th Dist. Cuyahoga No. 99931, 2014-Ohio-2051, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

### C. Whether T.Y. Has Been in the Agency's Temporary Custody for 12 or More Months of a Consecutive 22-Month Period

{¶ 27} With respect to the first prong of the permanent-custody analysis, we find competent, credible evidence supports the juvenile court's finding pursuant to R.C. 2151.414(B)(1)(d) that T.Y. has been in an agency's temporary custody for 12 or more months of a consecutive 22-month period.

{¶ 28} For purposes of calculating time under subsection (d), R.C. 2151.413(D)(1) provides that "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." In this case, T.Y. was initially removed from her Mother's care on July 10, 2020. She remained in the agency's emergency custody until she was adjudicated dependent on October 23, 2020, and committed to the temporary custody of the agency on November 4, 2020. Applying either date contemplated under R.C. 2151.413(D)(1), the record confirms that T.Y. had been in the temporary care of the agency for 12 or more months of a consecutive 22-month period at the time the motion for permanent custody was filed on December 9, 2021. Because the time requirements under R.C. 2151.414(B)(1)(d) were satisfied, it was

unnecessary for the court to determine whether any additional factor under R.C. 2151.414(B)(1) was applicable to the circumstances presented in this matter. *See In re M.G.*, 8th Dist. Cuyahoga No. 111144, 2022-Ohio-1077, ¶ 29, citing *In re L.W.*, 8th Dist. Cuyahoga No. 107648, 2019-Ohio-1344, ¶ 15, citing *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21.

### D. Best Interests of the Child

{¶ 29} Turning to the second prong of the permanent-custody analysis, we recognize "[t]he discretion that the juvenile court enjoys in [deciding] whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's [decision] will have on the lives of the parties concerned." *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994). Thus, we review a juvenile court's determination of a child's best interests under R.C. 2151.414(D) for abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47.

{¶ 30} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse """implies that the court's attitude is unreasonable, arbitrary or unconscionable."" *State v. Montgomery*, Slip Opinion No. 2022-Ohio-2211, ¶ 135, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). This court has held that an abuse of discretion may be found where a trial court "applies the

wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.). When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 31} "In determining the best interest of a child, a juvenile court 'may apply one of two different tests.'" *In re S.C.*, 10th Dist. Franklin No. 21AP-203, 2022-Ohio-356, ¶ 38, quoting *In re J.P.*, 10th Dist. Franklin No. 18AP-834, 2019-Ohio-1619, ¶ 39. "'Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors * * * to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *Id.*, quoting *In re J.P.* at ¶ 39. "By contrast, 'under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency.'" *Id.*, quoting *In re J.P.* at ¶ 39. "These two provisions 'are alternative means for reaching the best-interest determination.'" *Id.*, quoting *In re J.P.* at ¶ 40.

{¶ 32} In determining the best interests of a child pursuant to R.C. 2151.414(D)(1), the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 33} Although a juvenile court is required to consider each relevant factor under R.C. 2151.414(D)(1), "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Moreover, the Ohio Supreme Court has clarified that R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). "Consideration is all the statute requires." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31.

{¶ 34} In turn, R.C. 2151.414(D)(2) provides as follows:

If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child

cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

{¶ 35} Significantly, if the factors enumerated under R.C. 2151.414(D)(2) are applicable, permanent custody is per se in the child's best interest and the juvenile court is required to commit the child to the permanent custody of the agency. *In re G.A.*, 8th Dist. Cuyahoga No. 108932, 2020-Ohio-2949, ¶ 61, citing *In re J.R.*, 10th Dist. Franklin No. 17AP-698, 2018-Ohio-1474, ¶ 41.

{¶ 36} As previously stated, the juvenile court made alternative findings under R.C. 2151.414(D)(1) and (D)(2) in determining that an award of permanent custody to the agency was in T.Y.'s best interest. Under such circumstances, this court has held that it is unnecessary to determine if the court correctly applied the R.C. 2151.414(D)(1) factors because "[a] finding under section (D)(2) of R.C. 2151.414 mandates that the trial court find it is in a child's best interest to be placed in the agency's permanent custody." *In re A.S.*, 8th Dist. Cuyahoga Nos. 110422 and 110472, 2021-Ohio-3829, ¶ 42, citing *In re G.A.* at ¶ 59. Accordingly, our review focuses on the court's findings under R.C. 2151.414(D)(2).

**{¶ 37}** In this case, the juvenile court made the following findings in support of its determination that, pursuant to R.C. 2151.414(D)(2), permanent custody was in T.Y.'s best interests:

> There is evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent[;]
>
> * * *
>
> The child has been in the custody of the agency for two years, and the court cannot legally grant any further extensions of temporary custody. She does not qualify for a planned permanent living arrangement, and no one has filed for or been identified in a written motion for legal custody. The court finds the agency has made intensive efforts to locate relatives pursuant to R.C. 2151.416. The only options before this court are reunification or permanent custody.

**{¶ 38}** For the reasons that follow, we find there is competent, credible evidence in the record to support the juvenile court's reliance on the factors set forth under R.C. 2151.414(D)(2) and its conclusion that permanent custody to the agency is in child's best interests.

**{¶ 39}** To ascertain whether R.C. 2151.414(D)(2)(a) applies, we must look to R.C. 2151.414(E) because determining "that a child cannot be placed with the parents within a reasonable time or should not be placed with them, the court must find, by clear and convincing evidence, that at least one of the factors in R.C. 2151.414(E)(1)-(16) is present." *In re G.A.*, 8th Dist. Cuyahoga No. 108932, 2020-Ohio-2949 at ¶ 62, citing *In re S.C.*, 8th Dist. Cuyahoga No. 108036, 2019-Ohio-3664, citing *In re S.W.*, 11th Dist. Ashtabula No. 2017-A-0089, 2018-Ohio-1672.

{¶ 40} In this case, the juvenile court included findings under R.C. 2151.414(E)(1), (4), and (16), stating as follows:

(E)(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

(E)(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

(E)(16) Other relevant factors: In this case are the circumstances of [T.Y.'s] removal, the wishes of the child, the in camera interview, the child's progress in treatment, and the potential risks of disruptions if a reunification does not work out.

{¶ 41} The court further explained its reliance on these factors as follows:

At 13 years of age, the child was charged with domestic violence and the mother would not allow the child to return home. The child was placed in the custody of CCDCFS. The child has been in the agency's custody for over two years. The case plan required the mother to complete parenting [classes] and to participate in family counseling. She has not done either of these things. The testimony of the social worker and the child's GAL established that the child was hurt by the mother's failure to participate in counseling. Over the course of the last six months, the child has been doing very well in her placement. She has a 3.0 grade point average, is using the skills she learned in therapy, and is working on being a positive leader in her placement. Meanwhile, the issues that led to the child's removal remain unaddressed. The court is concerned that if the child is reunified [with Mother] and those issues resurface, the child will be blamed for the removal, and the child will bear the brunt of the emotional fallout from any future disruptions. She has been diagnosed with depression and PTSD and has been working on her coping strategies for over two years.

The issue before the court is not whether 15-year old T.Y. will have a relationship with her biological family as she is clearly capable of

reaching out to them. The issue before the court is her legal status with the agency, and whether she will be able to continue to grow into a healthy adulthood in a safe way that gives her hope and agency.

{¶ 42} In support of the foregoing findings, the court relied substantially on the testimony of social worker Sinkfield. In pertinent part, Sinkfield testified that Mother failed to successfully complete the requirements of her case plan and, therefore, failed to remedy the significant issues that caused T.Y. to be removed from her care. Mother took no actions to complete the necessary parenting-education courses and failed to consistently engage in family counseling to address the issues that predominated the conflicts between her and her child. On appeal, Mother suggests that she was willing to continue counseling but was prevented from doing so based on the agency's deference to the wishes of T.Y. Mother's position, however, ignores the legitimacy of T.Y.'s emotional reaction to Mother's failure to appear at counseling, and further attempts to diminish her own failures to resolve the alleged technological issues that allegedly caused her to miss sessions. Mother's position further conflicts with Sinkfield's testimony that Mother informed the agency that she no longer wished to continue with family counseling because of the technological issues and scheduling conflicts. (Tr. 16.) Similarly, when questioned by the court, Sinkfield reiterated that the parties' failure to complete family counseling in this case "was not because of the child's actions," but "was because of the parent's actions." (Tr. 38.)

{¶ 43} The record does demonstrate that Mother routinely visited and communicated with T.Y. when able to do so. Sinkfield acknowledged that Mother

and T.Y. have "interact[ed] pretty well" during visits, and that "Mother and [T.Y.] speak more often than they did prior" to T.Y.'s removal. (Tr. 17, 25.) Nevertheless, Sinkfield opined that permanent custody was in the child's best interests based on Mother's unwillingness to significantly address or otherwise rectify the issues that caused disputes between Mother and T.Y. in the past. Because Mother failed to demonstrate a willingness to comply with her case plan, Sinkfield testified that Mother and T.Y. "have [not] gotten to a level where they can effectively communicate with each other." (Tr. 17-18.) Thus, the agency was concerned that the issues that led to T.Y.'s removal would resume if she were to be returned to Mother's care. T.Y. shared these concerns and repeatedly expressed that she did not wish to return home.

{¶ 44} In contrast to Mother's unwillingness to comply with her case-plan objectives, the record reflects that T.Y. has excelled in her current placement and has successfully engaged in the services contemplated for her in the case plan. T.Y. has improved in school, has consistently taken prescribed medication, and has actively participated in individual and group counseling. While T.Y.'s personal achievements are commendable, they do not relieve Mother of her obligation to accept personal accountability and satisfactorily address the conditions that cause T.Y. to be removed from her care.

{¶ 45} Viewing this evidence in totality, we find the record clearly and convincingly supports the juvenile court's findings under R.C. 2151.414(D)(2)(a) and (E)(1), (4), and (16).

{¶ 46} We likewise find the evidence supports the juvenile court's findings pursuant to R.C. 2151.414(D)(2)(b), (c), and (d). As stated, T.Y. was removed from her Mother's home in July 2020, and remained in the agency's custody throughout the pendency of these proceedings. Accordingly, as of the date of the permanent-custody hearing, T.Y. had been in the agency's custody for two years or longer and no longer qualified for an extension of temporary custody. In addition, T.Y. did not meet the requirements for a planned permanent-living arrangement (to do so, a child must be at least 16 years old) and the agency was unable to identify any relatives who could take legal custody of her.

{¶ 47} Based on the foregoing, we cannot say that the juvenile court acted unreasonably, arbitrarily, or unconscionably in determining that it was in T.Y.'s best interest to grant permanent custody to the agency pursuant to R.C. 2151.414(D)(2). Accordingly, we find, the juvenile court's award of permanent custody to CCDCFS is supported by clear and convincing evidence in the record and is not against the manifest weight of the evidence.

{¶ 48} The first assignment of error is overruled.

### E. Due Process Considerations

{¶ 49} In the second assignment of error, Mother argues the juvenile court committed reversible error by considering matters that were not admitted into evidence at the time of the permanent-custody trial. Specifically, Mother contends that the juvenile court violated her due-process rights by citing facts contained in the GAL's written report and information gathered during the child's in camera

interview. For instance, Mother asserts that it was inappropriate for the juvenile court to reference T.Y.'s 3.0 grade average because this information was only contained in the GAL's written report.

{¶ 50} It is well settled that "in permanent custody proceedings, parents must be afforded due process before their rights can be terminated." *In re Hoffman,* 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, at ¶ 15. "Due process requires both notice and an opportunity to be heard." *O'Malley v. O'Malley*, 8th Dist. Cuyahoga No. 98708, 2013-Ohio-5238, ¶ 16, citing *In re Thompkins*, 115 Ohio St.3d 409, 2007-Ohio-5238, 875 N.E.2d 582, ¶ 13.

> "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."

*Thompkins* at ¶ 13, quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

{¶ 51} After careful consideration, we find no merit to Mother's due-process argument. In this case, the record contains ample testimony concerning T.Y.'s wishes, her improvements in school, and the recommendations of the GAL. These issues were thoroughly discussed during the permanent-custody hearing and counsel for Mother was provided the ample opportunity to further explore these issues during cross-examination. And, in fact, these issues were the substance of counsel's cross-examination of Sinkfield and the child's GAL. Under these circumstances, we are unable to conclude that the juvenile court violated Mother's

due-process rights by referencing information that was cumulative to the evidence adduced at the permanent-custody hearing.

{¶ 52} The second assignment of error is overruled.

{¶ 53} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EILEEN A. GALLAGHER, J., CONCUR